Angel **RIVERA**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 69640.

Court of Criminal Appeals of Texas, En Banc.

Feb. 20, 1991.

---

Luis E. Islas, El Paso, for appellant.

Steve W. Simmons, Dist. Atty., Robert Dinsmoor, Asst. Dist. Atty., El Paso, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appeal is taken from a capital murder conviction; the penalty assessed was death. Appellant challenges the sufficiency of the evidence supporting his conviction, as well as the sufficiency of the evidence supporting the jury's affirmative answers to the two special issues submitted during punishment. He also brings fourteen other points of error. After due consideration of appellant's contentions, we will affirm his conviction.

Jewell Haygood was an 88–year old widow who lived alone in her trailer home at Duchay's Trailer Court on Alameda St. in El Paso. She was in the habit of going to her stepson's house each day to help assemble church catechism books. Late in the afternoon of Friday, October 26, 1984, her neighbor Patricia Chavez noticed Jewell working in the yard around her trailer and concluded that Jewell had returned from her daily duties. There was nothing out of the ordinary in this observation. But about 4:00 a.m. on Saturday morning, Chavez heard the extraordinarily unusual sound of her neighbor's Fury II charging off into the night. She knew it was Jewell's car because of the characteristic engine noise she heard. The next day, she noticed that Jewell's car was gone, and that a blue jacket was lying beneath Jewell's open water heater door, which was situated beneath Jewell's bathroom window.

Meanwhile, Jewell's 76–year old stepson Herman Haygood had become concerned when Jewell had not arrived at his house as usual on Saturday morning. He and his brother David went to Jewell's trailer at

9:00 a.m., but decided that she was probably out at breakfast when they saw that her car was gone. When they still had not heard from her by 11:00 a.m., however, they returned to the trailer to see if anything was wrong. They noticed the blue jacket underneath the bathroom window and moved it to the landing by the front door. Herman later testified that the front door was open a crack and that he saw blood on the screen. The men pushed the door open and split up to search the trailer. They found the interior of the trailer in great disarray; at least one of Jewell's two televisions was gone, purses were on the floor, and the contents of drawers had been strewn about. Herman soon found his stepmother's body on the floor next to the bathtub, which was full of bloody water, feces, and several pairs of socks.

When the police arrived in response to the brothers' call, they secured the scene and began searching for physical evidence. Detectives Raul Acosta and Luis Ortega of the Identification and Records Bureau of the El Paso Police Department observed the blue jacket by the trailer's front door and seized it. Acosta noticed the bloodstains on the front door frame, and concluded that the perpetrator must have left through the front door. At trial, Ortega's testimony concerning the living room matched Herman's: the room appeared to have been ransacked, and purses were lying about on the floor. In the bedroom next to the bathroom, the bed was undone, drawers were open, and there were blood stains on the bed, ceiling, walls, closet, and drapes. A wet substance which Acosta believed to be urine was still on the bedsheets. On top of the bed, the officers found a piece of torn towel tied in a knot as well as a neck massager. A similar knotted towel, bearing bloodstains, was found in the bathroom.

The victim was found face-up on the bathroom floor, with her legs spread and her nightgown pushed up to her chest. Socks were on her feet, but she was wet from head to toe, apparently from having been in the filthy bathtub next to her. Her face and body were covered with bruises, her eyes were swollen, her hands were lacerated, and a trail of dried blood was visible coming from her mouth. Her genitals were particularly bloody, indicating that she had suffered some kind of a sexual attack as well.

Acosta noticed that the bathroom window had been disturbed, and that parts of the window frame were lying on the bathroom floor. Detective Alfonso Marquez later testified during the State's rebuttal portion of the trial that the police concluded that the bathroom window had been the intruder's point of entry into the trailer.

Acosta found that the ransacking observed in the living room and bedroom had occurred throughout the trailer. On top of the stereo, a square space without dust indicated a location where a television might have stood. Although Herman Haygood testified that his stepmother had kept two television sets in the trailer, no televisions were found in the trailer that Saturday. No money was found in any of the purses (except for one Canadian dollar), nor were the keys to the victim's missing car anywhere on the premises.

Sierra Medical Center Pathologist Jody Lawrence testified concerning his autopsy performed on the deceased's body. He found multiple lacerations of the face; a broken nose that had been mashed to the left; abrasions of the face, neck, chest, and back; multiple bruises all over the body; two black eyes; a semi-circular abrasion on the neck which made it appear that a ligature had been placed around the victim's neck, and multiple bruises on both forearms just above the wrists. His examination of the body's internal injuries revealed multiple broken ribs, hemorrhaging in the neck area, extensive damage to the bones and cartilage in the neck, and a one-inch tear in the rear wall of the vagina. Dr. Lawrence stated that all the bruises had to have occurred before death. In response to questions asking how the victim's injuries could have occurred, the doctor said that the arm bruises and tears were probably caused by grabbing the victim's forearms and dragging, propelling, or slinging the deceased around. The victim's facial condition was the result of a bad beating,

probably an encounter with a solid object like a floor or table. He believed that the victim had died from strangulation with some type of ligature—perhaps, but not necessarily, one of the knotted towels found at the scene. Because of the vaginal tear, the Doctor believed that the attack may have been sexually motivated, but he could say nothing more definite about the cause of tear than that it had been caused by a blunt object. Although the tear could have been caused by a penis, the doctor thought it more likely that the victim had been "manipulated."

Javier Flores and Juan Rojas, two DPS employees who analyze physical evidence, testified concerning the comparisons between hair samples taken from the trailer and samples from various suspects. Flores testified that there were four hairs recovered from the bedroom pillows that did not match the victim's hair. Of these four, one was consistent with appellant's hair samples, although Flores stressed that hair comparison was not as exact a science as fingerprint analysis. Three hairs matched neither appellant nor the victim. Rojas enumerated and detailed five specific similarities between appellant's hair and the one matching hair from the pillow, but he admitted on cross-examination that there were dissimilarities as well and that the hair "could have" come from another person. He testified that a hair sample from James Powers, whom the appellant tried to paint as the perpetrator at trial, matched none of the hairs found in the trailer, because it was noticeably lighter than any of them.

No physical evidence besides the one hair was found to link appellant to the crime scene.

Another group of State's witnesses consisted of people who testified to encounters with appellant between the time of the murder and the discovery of the victim's stolen car late on Sunday afternoon. Sylvia Guerra told the jury about a run-in she had with a man she identified as appellant who was driving a white car late on Saturday afternoon, October 27. Accompanied by her six year old daughter, she had just returned from town on a bus that had let her off at the corner of Alameda and Seville. From there, she began to walk the few blocks to her home. When she was about two houses away from her home, a white car with three occupants approached her. (She later identified the driver of the car as appellant, and identified the car as the one which ultimately turned out to have belonged to the victim). The car slowed by the side of the road, the driver said something to her, and the men all laughed. This scared Guerra, who then tried to hide in a neighbor's house until the car full of men disappeared. On Sunday afternoon, she saw the same three men in a blue car. Because of her scare on Saturday, she reported all this to the police.

Myra Deucher, a widow whose children were 19, 16, and 7 years of age, testified as to her acquaintance with Jewell Haygood: Herman Haygood's deceased wife Mildred had been the godmother of Myra's daughter Debra. Myra had also been acquainted with appellant; a mutual friend introduced him to her around June, 1984. Appellant eventually began asking Myra out on dates, but she always refused him because she was much older than he was. At trial, Myra described the relationship she and appellant had as more of a mother-son relationship than anything else. Over the summer and early fall months of 1984, appellant often frequented Myra's house, ate meals, played with her children, washed his clothes, washed up in her yard with the garden hose, watched television, and generally helped out with household chores. Sometime during this period, appellant asked if he could sleep in his blue car in front of the Deucher house, since he had no other home; Myra gave him permission, as long as he "stayed off" her house.

On Friday night, October 26, at about 9:15 p.m., appellant dropped by the Deucher home in a fancy black and white outfit and asked Myra to go dancing with him. As always, she refused to accept any kind of offer from him that resembled a date. He tried repeatedly to get her to go with him, but Myra remained resolute. Finally, appellant asked if he could come back later. Myra testified that she really wanted to

say "no", but she told him "yes" just to get rid of him. Appellant then drove off in his blue car.

After going to bed that night, Myra had difficulty sleeping. About 3:00 a.m., she called her sister and began a long phone conversation. While still on the phone with her sister, she noticed a two-door white car driving up to her house. When she peeked out the window to see who her early morning visitor was, she was able to identify appellant. Appellant was no longer wearing his dress clothes, having changed into what appeared to be a black shirt, black vest, and jeans. Appellant approached her front door and knocked repeatedly; when this evoked no response, he began ringing the bell. Myra's daughter Debra, then about 17 years old, came into the living room where Myra was and turned on the light. Myra then yelled "[t]urn off the lights. Angel is outside." Debra quickly turned the lights back off, and Myra instructed her not to open the door. Myra quietly watched appellant for a period of time she described as fifteen or twenty minutes. Finally, after gunning the engine of the white car, he drove off.

On Sunday, before noon, appellant drove up to the Deucher house in the same white car he had been driving early the previous morning. At that time, Myra commented that appellant seemed to have a new car. Appellant replied that a "friend" of his had loaned it to him. All this time he was acting very nervous. After a little while, he bid Myra a hasty farewell, saying that he had to return the car to his friend.

That night, on the television news, Myra and Debra saw a story about the Haygood murder in which a picture of Jewell's car was displayed. Myra testified that she had wondered if the car on TV might have been the car appellant had been driving.

Myra also provided a few other bits of important evidence. She told the jury that one of the bars appellant liked to patronize was the Midtown Bar, and she identified the blue jacket found underneath the victim's window as being similar to one appellant had worn when she had known him.

Debra Deucher, Myra's 18 year old daughter, corroborated many details of her mother's story. She identified appellant as the Angel Rivera she and her mother had become friends with sometime in 1984, and she also identified the victim's car as the one Angel was driving at about 4:00 a.m. on the morning of October 27, and around the middle of the day on Sunday. She also described appellant's usual vehicle as a large blue car, and repeated her mother's story about appellant's visits on Friday night, October 26; 4:00 a.m. Saturday, October 27; and midday Sunday, October 28. Two witnesses testified about the recovery of the victim's stolen car. The Plymouth Fury II was found about 6:00 p.m. on Sunday, October 28. It was parked by the side of the road in the 6800 block of El Paso Drive, which is about two miles from the homicide scene, according to the testimony of the officer who discovered the vehicle. (Another witness, however, testified that the spot where the car was discovered was only $2/10$ to $3/10$ of a mile away from the trailer court). Tim Miehl, an El Paso police detective, processed the car for fingerprints, but his testimony indicated that the car had been "wiped clean" so that no fingerprints were ultimately recoverable.

Three employees from the Burger King where appellant was working at the time of the murder testified during the State's case in chief. Susana Grajeda told the jury that appellant had been driving a blue car during the fall of 1984, and that she had seen him wearing a blue jacket similar to the one found below the trailer bathroom. However, she also testified that appellant normally wore a black jacket, and that she could not recall seeing a hood on appellant's blue jacket like the hood on the jacket from the homicide scene. Another Burger King employee, the former assistant manager of the store where appellant worked, testified that appellant used to wear a blue, nylon jacket like the one from the trailer, but that she, like Grajeda, could not recall seeing a hood on appellant's jacket. She also said that she thought she had seen appellant wearing his blue jacket after October of 1984.

The third witness from Burger King, Luis Wilson, also noted the similarities between the jacket from the scene and one the appellant used to wear. Unlike the others, he could definitely recall seeing appellant wearing the hood, but his memory of the appellant wearing the hood was of a very cold day—which he believed to be in December of 1984. More important than his jacket testimony, however, was Wilson's testimony that appellant had tried to sell him a small black and white television in November, 1984, as well as a man's watch and some women's jewelry.

The most important group of State's witnesses during its case in chief were those through whom appellant's jailhouse admissions were introduced. In December, 1984, appellant was in the El Paso County Jail in connection with another offense to which he confessed (the attack on Maria Lopez, described *infra*). Michael Rivera (no relation) was also in the El Paso County Jail at this time, and the two Riveras became acquainted while housed in the same cell block. Michael testified that he first met appellant on December 21, 1984, when appellant approached him and asked him for a cigarette. The two men then struck up a conversation and appeared to be developing a rapport. On December 22, the two men chatted again for about one and a half hours. Michael testified that during the course of this conversation, appellant told him that he (appellant) had killed an old lady at a trailer on Alameda Street. Eventually, over the course of their acquaintance, appellant told Michael that he had killed three old ladies: Dikes, Fleenor, and Haygood.[1] When Michael asked appellant if his fingerprints would be found inside the trailer, appellant just looked at his hands and laughed.

Unbeknownst to appellant, Michael took this information to the police on December 26, 1984. Detective De Anda from the Crimes Against Persons division testified that he checked Michael out of jail for an interview after receiving a call in which Michael indicated that he had some information about a crime that had been committed. De Anda refused to make a deal with Michael or to help him with his case, but he did take a statement from Michael concerning appellant's admissions.

On February 19, 1985, Michael saw appellant write part of a letter to his mother; he also saw appellant sign the letter. Appellant gave Michael the letter so that Michael could give it to his wife and thereby smuggle the letter out without it falling into the hands of prison authorities. (Michael's wife visited him frequently, but appellant had no visitors). Appellant's trust again proved foolhardy, since Michael gave the letter to police two days later, again asking for help with his case and again receiving no deal. On May 25, appellant told Michael that he wanted Michael to smuggle another letter out of prison for him, since he presumed that his mother had somehow never received the first one. The second letter was supposed to have been accompanied with a family picture, rosary, and Bible, but Michael discarded these extra items and turned appellant's second letter over to the police just like he had done with the first one.

The State then presented three witnesses to corroborate Michael's testimony and to establish the authenticity of appellant's letters. Edward Vigliotti testified that he was a carpet installer from New York who had come to testify only because his parole officer had told him that he had no choice. Around the early part of 1985, he had been an inmate at the El Paso County Jail. For a short time during his incarceration, he was housed in the same cell block as appellant and Michael Rivera. Vigliotti observed that appellant and Michael were very good friends. He testified that appellant was very open with Michael and trusted him. One day, when Vigliotti was in his cell about eight feet away from appellant and Michael, he overheard the end of a conversation in which appellant said something about putting an old lady from a trailer home on Alameda in a bathtub. Vigliotti also corroborated Michael's testimo-

---

1. Fleenor and Dikes were killed not long before Jewell Haygood in a mysterious arson, which the police believed to be related to the Haygood murder.

ny about appellant's letter writing, stating that appellant wrote letters frequently and gave them to Michael so that Michael could supposedly give them to his wife for transport into the outside world. The only reason the police knew about his knowledge, said Vigliotti, was that Michael had somehow gotten the police to ask for him in March, 1985. At that time, Vigliotti was taken down to the Crimes Against Persons office and interviewed by Detective Marquez. He gave a statement to Marquez, but received no favors for his testimony. Vigliotti testified that he served out the remainder of his prison sentence, including time in TDC.

Two experts also corroborated Michael's testimony. El Paso Police Department fingerprint examiner Art Orozco testified that he had found appellant's fingerprint on the May, 1985 letter; however he also testified that Michael's fingerprint was on the upper center of the May letter, and that only Michael's print could be identified on the February letter. Handwriting expert Allan Keown testified unequivocally that both letters were written by appellant, and that there was no evidence that the letters had been dictated to him by someone else.

Finally, appellant's letters to his mother were admitted into evidence. They read as follows:

Mom & Family

I want you to know now that I did what I did because you regret having me. I know I did wrong in stabbing the lady but I had to confess to you, that the other two murder that I committed were to show you that I was alive & human. I did do the other two and now I plan to take my own as well. So I hope every body will be happy when I'm gone.

Just me

Your Son

/s/ Angel Rivera

The second letter:

May 25, 85

Look, I'm writing this letter to let you know that what I'm writing isn't because I'm scared of anything, but I will tell you that I did take the color t.v. and a few other thing from the house. Sure I made her suffer in a very bad way, but she had it coming to her. But I know that they are going to charge me with the three charges they put on me. But when they charge me and indict me, then, and only then, will I tell them the truth about the three different crimes I've committed. But then the only ones that know what happen are the police and myself. I'm not sorry for what I did, but I enjoyed watching people suffer. And boy did she suffer before she died. But like I said if and when they charge me and indict me and produce a witness in trial will I confess the truth to the D.A. Everything I did, step by step to all three crimes. This is all I am going to say to you or anybody else until I am charged and indicted and taken to court. I want you to know that I didn't force myself to write this to you but I'm doing it because I trust you and I know that you wont rat on me. So God bless you and keep you safe. And may God have mierce (sic) on my soul. Always remember me in your prayers.

Always

Just Me..

P.S. Do me a big favor tear this up after you read this as I don't want this letter to fall into the wrong hands. Thanks you've been a great help.

(sic in passim)

After the State concluded its case-in-chief[2], appellant called nine witnesses to the stand in an attempt to raise the possibility that a man named James Powers had been the perpetrator. Appellant's star witness was a 56 year old widow named Ruth Rickets. Rickets, who resided in Cincinnati, Ohio at the time of trial, testified that she had lived in El Paso from early 1983 until July of 1985. James Powers was a neighbor at her apartment complex. She

---

**2.** The State did produce one witness in its case-in-chief whom we have not mentioned. David Strong, the foreman of the grand jury that indicted appellant, testified that the grand jury made diligent inquiry to determine the nature of the ligature that strangled the victim, but had been unable to make that determination.

described him as a younger man, perhaps in his early thirties. When Rickets first met Powers, she thought that he was a very nice young man, since he always spoke courteously and occasionally helped her out with her groceries.

One day, in October 1984, Powers asked Rickets if he could come over to her apartment to watch a certain football game on her TV, explaining that it was an important game and that he had no TV. Rickets agreed, but to her great dismay she found that Powers turned nasty once the game was over and refused to leave her apartment. According to Rickets, she was "held prisoner" in her own apartment for two days and two nights. Powers demanded that she cook for him, took money from her, threw out her asthma medication, and slammed her against a wall. What frightened Rickets the most were Powers' claims that he "off'd" old ladies and that she was next on his list. Besides claiming to have killed old ladies in other states, Powers recounted how he had killed several ladies in El Paso. In one case, for example, he claimed to have entered a trailer home on Alameda and been mistaken for his victim's son. Powers said that when the victim called to him from the bathtub, he went to the bathroom and "stomped her till she shit", then stole a coat and some rings from her. He also held up a can of alcohol with a can of lighter fluid and told Rickets that he had covered up his strangulation of two other old ladies with a fire he had set. (An apparent reference to the Fleenor and Dikes murders). As he held up pantyhose, Powers told Rickets that he used them to "off" his victims. To further terrify Rickets, Powers told her that he had ripped the vagina of the old lady he had killed in the trailer, and that he had stolen her car because he needed it for his job "collect[ing] from the old ladies."

After testifying to the facts above, Rickets continued her testimony along lines

that apparently took both appellant and the State by surprise. She testified that one Sunday, not too long after October, 1984, Powers forced her to accompany him to the Midtown Bar, a place Myra Deucher mentioned as a favorite haunt of appellant's. At the Midtown, Powers met with two Mexican males; one fat, the other, skinny. The three men began comparing tattoos and discussing prison and prison life. She testified that appellant looked exactly like the "fat" man from the Midtown bar, and, apparently to everyone's surprise but her own, she then made a positive in court identification of appellant as the man Powers had been chatting with that Sunday in the bar.[3]

Another defense witness, Alicia Carter, testified that she was a friend of Michael Rivera's wife Norma. Carter claimed that when she met Michael, he told her that his job as an undercover detective accounted for his recent presence in jail. He also told her that the police were trying to "frame" appellant, that he was working with Detective Marquez on appellant's case, that he was being intentionally moved around the jail to stay with appellant, and that appellant had "confessed." However, Carter also testified that she did not know what the word "frame" meant, and that although Michael claimed to be receiving $800 every two weeks for his undercover work, his wife was living a "poverty-stricken" lifestyle during Michael's incarceration and had to borrow money from others on several occasions just to get by. Carter acknowledged that she now knew that Michael had actually been in jail for impersonating a DEA agent.

Her last encounter with Michael came sometime around November, 1985. Michael showed up at her house, concerned that the police were after him because of a fight. From Carter's house, he called Detective Marquez and had a brief conversa-

3. Although Rickets was called by appellant, she was very cagey about speaking to either side before trial. Testimony from outside the jury's presence indicated that she had spoken to one of the district attorney's investigators who flew to Cincinnati to see her, and briefly to employ- ees of one of the defense attorneys, but she only spoke to the attorneys themselves once before trial—in a special meeting where attorneys for both sides were present. Apparently, nothing was said about the Sunday visit to the Midtown at this joint pretrial interview.

tion. Carter testified that she had never seen Michael Rivera after this incident.

The remainder of appellant's evidence either attempted to connect Powers to the offense or to cast doubt on aspects of the State's case. Hospital Records were introduced to show that Powers admitted himself to a hospital about twenty-four hours after the Haygood killing, complaining of a head injury. Robert Wyckoff, who managed the Burger King where appellant was employed at the time of the murder, testified that Burger King records showed that appellant arrived on time for work about 5:00 a.m. on Saturday morning, October 27. Candace Collazo and her son Brandon Gower attempted to establish an alibi for appellant covering the time of the Fleenor and Dikes murders on the night of October 14, 1984. They testified that appellant was living with them at the time, that he definitely stayed the night with them October 14, and that he spent the day with them on October 15 at Western Playland amusement park for Gower's birthday. S.J. Graham, manager of the apartments where Powers and Rickets had lived, testified that the police had come searching for Powers on one occasion, and that Powers had fled from them. Charles Henry Tymony, a friend of Powers from 1984 testified to several personal qualities of Powers, only a couple of which have any conceivable relevance to the case: that Powers was a bragger and that he was afraid of Mexicans. John Garmon, an employee of the TV station the Deuchers claimed to have been watching when they supposedly saw a picture of the victim's white car, told the jury that no such picture had appeared on any of his channel's newscasts on the night in question, but he could not say whether some other station might have covered the discovery of the stolen car. Finally, Alex Crawford, an administrative lieutenant with the sheriff's department, testified to several coincidental transfers of Michael Rivera and appellant and to the fact that appellant was prescribed two daily 100 mg. doses of Mellaril while in the El Paso County Jail.

Six witnesses testified during the State's rebuttal. Three of them related facts and circumstances connected to an extraneous offense to which appellant had already pleaded guilty. Maria Lopez was the victim of the extraneous offense, an aggravated sexual assault which almost resulted in her death. Lopez testified that she was a 59 year old woman who had known appellant for twenty or twenty-five years; her house was only three houses away from appellant's mother's house. On December 20, 1984, she was alone in her house because her son had left for work. Late in the evening, the power unexpectantly went out, but Lopez went to sleep anyway. When she woke up some time later, she saw a man standing over her. The man said that he was going to kill her. He began stabbing her all over her body—especially in her hands, face, and arms. Lopez felt one arm go numb, and she felt a pain developing in her back. As the assailant and Lopez struggled, he threw aside the bedcovers and tossed his victim to the floor. He grabbed her by the throat, and started choking her and hitting her in the face. Then he began a sexual assault: pulling her nightgown up and her panties off, lying on top of her, rubbing his penis against her and biting her all over. Next, he rolled off of her and fingered her rectum and vagina, and then he climbed on top of her and began rubbing himself on her again. By this time, Lopez recognized her assailant and said "Angel, think about your mom! Look what you're doing!" After hearing Lopez cry out, appellant stopped his attack and apologized. He went to the phone and called for the police to come help his victim, then he came back to where Lopez could see him and vomited. As he fled, he poured water on Lopez' head and told her "you're going to live, Mary." Soon after appellant was gone, Lopez passed out. When the police arrived, they took her to the hospital, where she remained in intensive care for several days. Lopez recalled that appellant may have been wearing gloves during the attack, and that he must have entered through the bathroom window because she had left that window closed before going to sleep, but the police arriving on the scene had found

the screen around the window bent and dislodged and the window open. Two police officers testified about physical evidence connected with the Lopez attack. Art Orozco testified that he recovered five latent fingerprint lifts from the crime scene, but that none of them could be positively matched with appellant. Jose Duron told the jury how he found a discarded pair of plastic gloves in the alley behind Lopez' home during his investigation on the day after the attack.

Christopher Hines, president and owner of Western Playland, testified that Western Playland was generally closed on Mondays, and that the park's business records indicated that October 15 had been no exception, thereby casting doubt on Candace Collazo and Brendan Gower's testimony purporting to establish an alibi for appel-

lant pertaining to the Fleenor–Dikes fire. Police detective Al Medrano also testified, stating that he was about the same size as James Powers and demonstrating that the blue jacket found at the Haygood crime scene was too small for him.

Finally, the State put on its last witness, Detective Alfonso Marquez. Marquez reiterated the testimony of previous witnesses about his meetings with Michael Rivera, the bathroom being the point of entry into Jewell Haygood's trailer, the televisions taken from the trailer, and the recovery of the victim's stolen car. New information that he provided to the jury included the fact that appellant had tendered a written confession to police concerning the Lopez attack, and his opinion that Ruth Rickets was intoxicated when she gave police her statements about Powers.[4] Because she

**4.** Appellant's confession to the Lopez attack was also introduced through Detective Marquez. After preliminary warnings, it read as follows:

My name is Angel Rivera. I live at 6236 Cleveland. I am 27 years of age.

I am currently in the Crimes Against Persons Office where I am giving this statement to Det. Alfonso Marquez, of my own free, will without any promises or threats of any kind. I have been read my rights by Det. Marquez and I wish to state that I fully understand them, and have signed, dated, and timed a Miranda Warning Card. I wish to waive my rights at this time and give this statement. I understand and speak the English language and I did drop out of school. in my senior year.

At this time I wish to state that I am responsible for the stabbing, beating, and rape of a lady on Cleveland St. I don't know the address to her house, but I know her to be Maria Lopez, who lives about three houses away from mine. I have known Maria Lopez for I don't know how long, since about I was a little kid.

I was going to sleep in the truck, but couldn't sleep. George brought me out some blankets, but still couldn't sleep. I then got out of the truck and started walking down Yandell. I then got on Cleveland Street, and I saw Maria Lopez's house. I wanted to go into the house to sleep. I went into the house through the window in the back. I don't remember what that window lead to. I don't remember if there were any lights on. I was in the kitchen, and as I passed the table, I felt a steak knife on the table. I grabbed the steak knife and heard some noises coming from the bedroom. The noises I heard were like the bed, creaking. I went to the bedroom, but it was dark. I did not know at the time it was

Maria, because I thought Maria was not home. This is because I did see any cars out front. (sic)

I stabbed her once, and she stopped me. She then told me my name, or called my name a couple of times. She kept telling me, 'Angel Para, Parale'. (Angel, Stop, Stop it).

I don't remember how many other times I stabbed her. I do remember stabbing her several times but can't put a number to them. I pulled down my pants, but I don't remember having sexual intercourse with her. I don't remember what Maria was wearing at the time, and all this took place in her bedroom. I was wearing Black pants, beige short sleeve shirt, black boots, and black leather zipper jacket. I was not wearing any underwear nor socks. I still have the same boots on right now and the clothes I was wearing last night are at my mothers house. I took them off and left them in the bathroom.

After I did what I did, I left the house but can't remember how I got out of the house. I woke up this morning in the Truck, that belongs to George, and I had blood all over my self. I had blood on my face, and on my pants. I went to the backyard of George's house and washed up with the water hose. I then went to my mothers house and changed clothes. When I got home my mother told me that the Police were looking for me.

I remember calling the Police for Maria, and telling that I had done something wrong. Maria then asked me for the phone and she talked. This is when I walked out, of the house.

I then consented to some examination at Sierra Medical Hospital for Rape.

I then was brought to the Crimes Against Persons Office where I'm giving this state-

was intoxicated, Marquez did not consider her a reliable source of information. He also stated that he had interviewed Powers personally concerning the Haygood murder, and had eliminated Powers as a suspect because he was too large a man to enter through the bathroom window, and because his hair was a different color than any of the hair found at the crime scene.

The last witness at trial was appellant's one rebuttal witness, parole officer Ramon Borrego. Borrego testified that he had been James Powers' parole officer, that his last contact with Powers had been January 8, 1985, and that Powers had left the jurisdiction without his permission.

 We now turn to an examination of appellant's first three points of error, which complain of the sufficiency of the evidence to support a verdict of guilty to a capital murder charge. The elements of the offense which the State must prove in order to sustain a guilty verdict in any given case are those set forth in the charge given to the jury. *Boozer v. State*, 717 S.W.2d. 608, 610–611 (Tex.Cr.App.1984). The charge in this case authorized conviction for capital murder only as set forth in paragraph VI.

Now, if you find from the evidence beyond a reasonable doubt that [1] on or about the 26th of October, 1984, [2] in El Paso County, Texas, [3] the Defendant, ANGEL RIVERA [4] did intentionally or knowingly [5] cause the death of an individual, JEWELL WILLIAMSON HAYGOOD, [6] by strangling the said JEWEL WILLIAMSON HAYGOOD [7] with an item unknown to the Grand Jury, [8] and the said ANGEL RIVERA did then and there intentionally cause the death of the said JEWELL WILLIAMSON HAYGOOD, in the course of committing the offense of Burglary, to-wit: the said Defendant on or about the 26th day of October, 1984, in the county and state aforesaid, did then and there [8A] unlaw-

fully, intentionally, or knowingly, and [8B] without the effective consent of JEWELL WILLIAMSON HAYGOOD, [8B] enter a habitation [8C] owned by the said JEWELL WILLIAMSON HAYGOOD [8D] and did then and there commit or attempt to commit theft, ... then you will find the Defendant, ANGEL RIVERA, guilty of capital murder committed in the course of committing burglary, as charged in the indictment.

(bracketed numbering of elements added). With respect to each element set forth above, we must look at all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed the element established beyond a reasonable doubt. *Blankenship v. State*, 780 S.W.2d. 198 (Tex.Cr. App.1989); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d. 560 (1979).

Sufficiency of the evidence with respect to most of the elements above is not specifically challenged. Appellant's contentions concerning the sufficiency of the evidence during the guilt/innocence phase are two: that this was a circumstantial evidence case in which the State's evidence failed to exclude every other reasonable hypothesis besides the appellant's guilt, and that the evidence was insufficient to prove that the murder was committed in the course of committing burglary as specified in the indictment.

 Appellant argues that this is a circumstantial evidence case in spite of appellant's oral admissions to Michael Rivera and Edward Vigliotti and his written admissions in the letters reprinted above. It is appellant's contention that a close reading of the letters shows that appellant was referring to the stabbing of Maria Lopez, and not to the victims in this case. While this could conceivably be true with respect to the first letter, it could not be true with respect to the second letter, since appellant

ment. As for the steak knife I left it in the bedroom, of Maria's house. I took a pack of cigarettes from Maria's house, which were Pall Malls. I still have them in my pants pocket and I have given them to Det. Marquez.

This is all that I can remember at this time. I have read the above statement consisting of two pages and I have found it to be true and correct to the best of my knowledge.
/s/ Angel Rivera

writes about taking the color TV and "a few other things" in the second letter, a statement that clearly refers to the Haygood murder, not the Lopez attack in which the evidence shows only a pack of cigarettes to have been taken.[5] The second letter also refers to the victim suffering before she died, and Lopez did not die. (It is possible, however, that appellant was referring to the Lopez attack without realizing that Lopez had survived). In the context of his oral admissions, both of his written admissions refer to the Haygood murder. Appellant's admissions that he had "killed an old lady at a trailer on Alameda Street" and that one of his victims had been named Haygood, at least when coupled with the letters quoted above, constitute direct evidence of appellant's guilt. *See Barefoot v. State*, 596 S.W.2d. 875, 880 (Tex.Cr.App.1980).[6] Since there was direct evidence of direct evidence of appellant's guilt, we will not employ the "exclusion of every other reasonable hypothesis" "analytical construct" when applying the *"Jackson v. Virginia"* standard for sufficiency of the evidence.[7]

Appellant's other insufficiency argument is that the evidence is insufficient to prove that the murder was committed in the course of burglary, because "there is no evidence to suggest that the murder occurred in the course of committing or attempting to commit a theft." Citing *Cruz v. State*, 629 S.W.2d. 852 (Tex.App.—Corpus Christi 1982, pet. ref'd), appellant argues that murder and a subsequent theft do not constitute capital murder unless the violent conduct causing death was done with the intent to obtain or maintain control over the victim's property. According to appellant, " '[i]n the course of committing or attempting to commit' is the phrase which requires the mens rea of the theft to accompany the violent conduct which causes death." Appellant also cites *Pinkerton v. State*, 660 S.W.2d. 58 (Tex.Cr.App. 1983) for the proposition that the intent with which a burglarious entry is made is an essential element of the offense; he therefore reasons that since the evidence in this case is inconclusive as to appellant's intent to commit theft at the time of his entry into the trailer, the State has not proven beyond a reasonable doubt that appellant murdered the victim in the course of committing burglary as alleged in the indictment.

Appellant is correct in asserting the ambiguity of the evidence of intent at the time of entry. Dr. Lawrence did indeed testify that there were sexual overtones to the murder. Appellant's intent upon entry could have been to commit theft, to commit murder, to commit sexual assault, or any combination of the three. However, appellant's specific intent upon entry into the habitation is irrelevant to the type of burglary alleged in the indictment.

■ The indictment alleges that appellant committed burglary as defined in V.T. C.A., Penal Code 30.02(a)(3); appellant's argument is constructed as though the indictment alleged the alternative definition of burglary in V.T.C.A., Penal Code 30.-02(a)(1). The State need neither plead nor prove a burglar's intent to commit a felony or theft upon entry under (a)(3) of V.T. C.A., Penal Code 30.02. *Davila v. State*, 547 S.W.2d. 606, 608 (Tex.Cr.App.1977); *Hammond v. State*, 664 S.W.2d. 838, 840 (Tex.App.—Corpus Christi 1984, no pet.);

---

5. In the context of appellant's oral admissions and the second letter, even the first letter probably refers to the Haygood murder, either when it says "the other two murder that I committed" (sic) or when it refers to the "stabbing", since appellant seems to be counting the "stabbing" as a murder when he follows it with a reference to the "other two murder." Perhaps appellant meant "strangulation" when he said "stabbing", perhaps he is referring to some unknown killing, or perhaps he did not realize when he wrote the letter that Maria Lopez had survived his attack. At any rate, we cannot say that even the first letter does not refer to the instant case when we view it "in the light most favorable to the verdict."

6. *Barefoot* was a capital murder case. In *Barefoot*, we held that when the accused admits or confesses killing the deceased, proof of the admission or confession is direct evidence of the main inculpatory fact and that a charge on circumstantial evidence is not required. *Barefoot*, 596 S.W.2d. at 880.

7. *See Butler v. State*, 769 S.W.2d. 234, 238 at f.n. 1 (Tex.Cr.App.1989).

*Practice commentary—1973*, V.T.C.A. Penal Code § 30.02.[8]

Appellant's argument misapplies *Cruz* and *Pinkerton* to the facts of this case, construing both cases too broadly. *Cruz* involved murder in the course of committing or attempting to commit *robbery;* in that context, "murder and a subsequent theft do not constitute capital murder unless the violent conduct causing death was done with the intent to obtain or maintain control over the victim's property" because the violent conduct causing death must occur "in the course of committing theft" in order for the killer's acts to have constituted a robbery. See V.T.C.A., Penal Code, §§ 29.02, 29.01, 31.01, 31.03. This case involves murder in the course of burglary, not robbery, so *Cruz* is inapposite.

Similarly, *Pinkerton*'s statements about a burglar's specific intent upon entry being an essential element of the offense of burglary apply only to the kind of burglary alleged in that case, namely § 30.02(a)(1) burglary, not to the § 30.02(a)(3) type of burglary alleged in the case at bar.

■ We are now left with the question of whether the evidence shows that the victim was murdered while appellant was "in the course of committing burglary" as burglary is defined in § 30.02(a)(3) of the Penal Code. "In the course of committing" as used in Penal Code § 19.03(a)(2) has been construed to mean conduct that occurs "in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense." *Riles v. State,* 595 S.W.2d. 858, 862 (Tex. Cr.App.1980). Considering the abundance of evidence which identifies appellant as the murderer (his admissions, the extraneous offense, the jacket, his size, and the hair) and the thief (Guerra and the two Deuchers' testimony placing him in the victim's stolen car soon after the murder as well as his admissions and his possession of

the televisions he wished to sell soon after the crime), as well as the evidence tending to show that appellant entered the trailer by breaking in through the bathroom window, encountered the victim in her bedroom, took her to the bathroom, ransacked the house, took the televisions and the car, and possibly some money, we hold that a rational trier of fact could have found that appellant committed the murder while in the course of burglarizing the victim's house by intentionally, knowingly, or unlawfully entering the trailer without her effective consent and then committing theft. *Cf. Huffman v. State,* 746 S.W.2d. 212 (Tex.Cr.App.1988) (evidence that victim was murdered in trailer and that victim's automobile was stolen about that time by murderer sufficient to prove murder "in the course of" robbery); *Bower v. State,* 769 S.W.2d. 887 (Tex.Cr.App.1989) (when the evidence was viewed in the light most favorable to the verdict, there was no other reasonable hypothesis besides the murder having been committed in the course of a robbery) (plurality opinion). We also hold that the evidence was sufficient with respect to the other elements in the charge. Appellant's first three points of error are overruled.

■ Appellant's fourth point of error complains that the indictment is fundamentally defective because it fails to allege a capital murder. Appellant offers no argument in support of his contention, nor does he cite any supportive authority for his naked assertion. The language of the indictment tracks the language of the jury charge quoted above. This language adequately charges capital murder under V.T. C.A., Penal Code § 19.03(a)(2). *Ellis v. State,* 726 S.W.2d. 39, 45 (Tex.Cr.App.1986) and *Pinkerton v. State,* 660 S.W.2d. 58, 63 (Tex.Cr.App.1983).[9] Appellant's fourth point of error is overruled.

**8.** "Section 30.02(a)(3) includes as burglary the conduct of one who enters without effective consent but, lacking intent to commit any crime upon his entry, subsequently forms that intent and commits or attempts a felony or theft. This provision dispenses with the need to prove intent at the time of entry when the actor is caught in the act." *Practice Commentary—1973,* supra.

**9.** These two authorities, considered together, demonstrate that the language in the instant indictment is sufficient. The indictment in *Ellis* was held sufficient to charge capital murder in the course of burglary; the instant indictment

Appellant's fourteenth point of error complains that the evidence is insufficient to sustain the jury's affirmative answers to the two special issues submitted during the punishment phase. The two special issues in this case were:

(1) Was the conduct of the defendant, ANGEL RIVERA, that caused the death of the deceased, JEWEL WILLIAMSON HAYGOOD, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

(2) Is there a probability that the defendant, ANGEL RIVERA, would commit criminal acts of violence that would constitute a continuing threat to society?

The evidence available to the jury in answering these questions consisted of all the evidence from the guilt/innocence phase of the trial as well as additional testimony from three State's witnesses who testified during the penalty phase of the trial. Angelo Diaz, an assistant deputy clerk from the El Paso District Clerk's office, testified that appellant pleaded guilty to one count of sexual assault in connection with the Maria Lopez attack, which had been described to the jury in detail during the previous phase of the trial. John Wesley Start and Keith Vince McCauley, two police officers from Riverside, California, testified to a violent incident involving appellant that took place in 1981. Both officers were summoned to a domestic dispute in Riverside between 4 and 5 a.m. in the morning. When they arrived, they saw appellant holding a knife to the throat of a young, hispanic female who was begging him to leave her alone. While she and appellant were yelling at each other, the policemen heard him say that he would kill her if the "cops" came in the house. The police were then able to enter the house and disarm appellant after a brief struggle. Although the woman appeared to have red marks around her face and neck, she incurred no other injuries. After the policemen talked to the woman, they found out that she was appellant's wife.

The two witnesses also testified that they had talked with a housemate of appellant's at a location not far from the scene of the domestic dispute. The housemate told the officers that he had heard appellant and his wife arguing in their bedroom. When the housemate had entered the bedroom, he had seen appellant choking his wife. The housemate had then grabbed appellant and pulled him away from his wife, but appellant had then grabbed one of the children who was present and threatened to harm him if the housemate did not back off. Apparently, it was at that point that the housemate summoned the police to the scene.

Appellant argues that this evidence, coupled with all of the evidence introduced in the guilt/innocence phase, is insufficient to support affirmative answers to the special issues reprinted above. In support of this contention, he cites *May v. State*, 618 S.W.2d. 333, 343 (Tex.Cr.App.1981). This authority actually supports the affirmative answers to both special issues. *May* involved a defendant on trial for his participation in a murder for hire scheme. *Id.* After the State reintroduced all the evidence from the guilt/innocence phase of the trial, and produced evidence that appellant had been involved in some other murder for hire schemes, this Court held that sufficient evidence had been adduced to support affirmative answers to both special issues. *Id.*

The standard for reviewing the jury's answers to the special issues is whether the evidence, when viewed in the light most favorable to the verdict, would lead any rational trier of fact to make the finding beyond a reasonable doubt. *Livingston v. State*, 739 S.W.2d. 311, 340 (Tex. Cr.App.1987). In view of the multiple wounds inflicted on the victim, the beating she took, the sexual assault she suffered, the fact that she was strangled, and appellant's statements in his letters about making his victim suffer, we conclude that a reasonable jury could have answered the

---

alleges everything the *Ellis* indictment did except for the specific address of the victim's burglarized habitation. *Pinkerton* held that such an

allegation of the habitation's location need not be included in an indictment for capital murder under § 19.03(a)(2).

first special issue in the affirmative. *See Duffy v. State,* 567 S.W.2d. 197, 209 (Tex. Cr.App.1978). The jury's answer to the second special issue must also be seen as one a rational jury could arrive at in light of appellant's confessions to three murders and a sexual assault, his statement that he liked to make people suffer, the evidence that he had threatened his wife and a child with a knife several years earlier, and the heinous facts of the instant case. See also *Id.* Appellant's fourteenth point of error is overruled.

▆ In his fifteenth point of error, appellant complains that the imposition of the death penalty is cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution. As appellant himself concedes, this contention has been raised and rejected by this court and the United States Supreme Court. *See, e.g. Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d. 929 (1976); *Goodman v. State,* 701 S.W.2d. 850, 867 (Tex.Cr.App.1985). Appellant's fifteenth point of error is overruled.

Appellant's sixteenth point of error presents multiple arguments, none of which are supported by any caselaw or statutory citations. Appellant claims that a variety of circumstances indicate that his fifth, sixth, and fourteenth amendment rights were violated during the course of his trial. This point of error is multifarious and presents nothing for review. *Thomas v. State,* 723 S.W.2d. 696, 697 at n. 2 (Tex. Cr.App.1986). Appellant's sixteenth point of error is overruled.

▆ In appellant's ninth point of error, he complains that the El Paso County District Attorney's office was guilty of intentional prosecutorial misconduct when it failed to inform appellant that defense witness Ruth Rickets could identify appellant as one of the men James Powers met with at the Midtown bar. Since this information was definitely inculpatory, appellant argues that the District Attorney's office had a duty to inform appellant that she might make an in-court identification of appellant. However, the prosecution has no general duty to disclose inculpatory evidence, particularly when that evidence comes from a witness called by the defense; rather it is the constitutional duty of the prosecution to disclose *exculpatory* evidence to the defense. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d. 215 (1963). We will also note that the State was not aware of these facts until Rickets testified. Appellant's ninth point of error is without merit and is overruled.

▆ Appellant's remaining eight point of errors complain of the admission of various items of evidence. His fifth and eighth points of error claim that the trial court should have suppressed the in-court identifications of Sylvia Guerra and Ruth Rickets. Appellant claims that a photographic spread shown to Guerra nineteen months after the time of the murder tainted her in-court identification because it was impermissibly suggestive and gave rise to a substantial likelihood of misidentification. However, there is no showing of any impropriety in the manner in which the photographs were shown to appellant. The five photographs shown to Guerra were all hispanic males in similar poses, of similar appearance, of approximately the same age. Additionally, the investigator who showed the photographs to Guerra testified that he never told Guerra that he thought he had the man who was driving the car. He simply told her that he had some photographs for her to view and he wanted her to look at them very carefully. She looked at the photographs for two to three minutes each before selecting appellant's picture. This pretrial identification procedure was not suggestive and did not taint her in-court identification. *Allen v. State,* 511 S.W.2d. 53, 54 (Tex.Cr.App.1974). Appellant's fifth point of error is overruled.

▆ Appellant's eighth point of error is similar to his fifth one. He claims that Ruth Rickets' in-court identification should have been suppressed because it was the product of an unduly suggestive one on one photographic show up and because it was the product of a picture that Rickets saw in the newspaper on the day before her testimony. After a thorough review of Rickets' testimony, we find little evidence that the

pre-trial show-up was unduly suggestive. Rickets told the court that Investigator Gray showed her a picture of appellant when he talked with her at her home before trial, but that he did not tell her who appellant was. She also testified that she did not recognize him in the picture because his haircut in the picture was so different from his haircut in the Midtown Bar or at trial. The evidence does not show whether Gray showed Rickets more than one picture during the interview. We also note that Rickets unequivocally testified that her recollection was based on the fifteen minutes she had to observe appellant that Sunday afternoon in the Midtown Bar, not on the photograph Gray showed her or the newspaper picture she saw before testifying. In light of these circumstances, appellant's eighth point of error is overruled. *Holloway v. State,* 691 S.W.2d. 608, 615–616 (Tex.Cr.App.1984).[10]

■ In his sixth and seventh points of error, appellant complains that the testimony of Myra and Debra Deucher, and particularly their in-court identifications of appellant, should have been suppressed because they were in the courtroom during the first day of trial after "the rule" had been invoked. See former Art. 36.03, V.A.C.C.P. (effective at the time of trial; now replaced by Tex.R.Crim.Ev. 613); Art. 36.05, V.A.C.C.P. Appellant cites one case in support of his contention: *Archer v. State,* 703 S.W.2d. 664 (Tex.Cr.App.1986). That case is inapplicable because it involves a violation of the rule; in this case, there was no violation of the rule because the evidence showed that the Deuchers had not yet come forward on the first day of trial; they were not known to be witnesses, and were not covered by the invocation of the rule on the first day. *See Nixon v. State,* 165 Tex.Crim. 602, 309 S.W.2d. 454 (App.1958). Appellant's sixth and seventh points of error are overruled.

■ Appellant's tenth through twelfth points of error complain about the admission of appellant's oral statements to Michael Rivera, the two letters appellant gave to Michael, and the oral statement appellant made which was overheard by Edward Vigliotti. All of appellant's arguments asserting the inadmissibility of these statements hinge on the notion that Michael Rivera was an agent of the State whose presence with appellant made the statements available to the prosecution as evidence. Michael Rivera, Detective Marquez, and Detective De Anda consistently testified against this proposition. According to their testimony, no arrangement between the State and Michael ever existed. The only contrary testimony presented by appellant was the testimony of Alicia Carter, who testified that Michael Rivera told her that he was an undercover detective working to "frame" appellant. The trial judge, sole judge of the credibility of the witnesses at the suppression hearing, apparently chose to believe Michael Rivera and the detectives. The trial judge's findings should not be disturbed absent a clear abuse of discretion. We cannot say that such an abuse of discretion has occurred in this case. *See Meek v. State,* 790 S.W.2d. 618, 620 (Tex.Cr.App.1990). Appellant's tenth through twelfth points of error are overruled.

Appellant's thirteenth point of error contends that the trial court erred in admitting evidence of the Lopez attack in front of the jury. He complains generally about the admission of all of Lopez' testimony as well as appellant's confession to the attack. He does not set forth reasons and authorities for his contentions, but states that he "resubmit[s] the arguments made by both the Defense and the State at trial" in support of this point of error. At trial, appellant's attorney argued that the extraneous material was improper rebuttal, that its prejudicial value outweighed its probative effect, that the confession was impermissible bolstering of Lopez' testimony, and that the confession was duplicative evidence. This point of error is multifarious and presents

---

**10.** We also note that Rickets was called by appellant, not by the State. On direct examination, Appellant brought out the fact that Powers had taken Rickets to the Midtown Bar one Sunday afternoon. This entitled the State to inquire about what occurred inside the bar on cross examination.

nothing for review. *Thomas v. State,* 723 S.W.2d. 696, 697 at f.n. 2 (Tex.Cr.App. 1986). We have, however, undertaken an evaluation of appellant's claim in the interest of justice, and we find it to be without merit. Appellant's thirteenth point of error is overruled.

Having determined that none of appellant's points of error are meritorious, we affirm the judgment of the trial court.

TEAGUE, J., concurs in the result.

OVERSTREET and MALONEY, JJ., not participating.