Green-F. v. State 















IN THE
TENTH COURT OF APPEALS
 

No. 10-91-105-CR

        FRANKIE GREEN,
                                                                                                        Appellant
        v.

        THE STATE OF TEXAS,
                                                                                                        Appellee
 

From the 278th District Court
Leon County, Texas
Trial Court # 7397-B
                                                                                                    

O P I N I O N
                                                                                                    

          A jury convicted Frankie Green of aggravated robbery and set his punishment at ten years
in prison. We affirm.
          In the evening of November 26, 1990, Percy Westmoreland closed his grocery store in
Normangee, took a large amount of cash, checks, and food stamps with him, and drove home. 
As he was about to enter his home, someone struck him in the head, took the sack containing the
cash, checks, and food stamps, and fled the scene. Westmoreland, aged seventy-eight, received
serious injuries in the attack. 
          Sheriff Wilson and Ranger Connell received a tip that Dennis Darnell had seen Frankie
Green, a Franklin high school student, with a large amount of cash on November 28. Wilson and
Connell talked to Darnell who confirmed the tip. Steven Edwards also told Connell that he had
seen Frankie Green wearing new clothes at school on November 27. Kathy Hawkins told Connell
that she overheard Nicholas Edwards tell Frankie Green, "We got him," to which Green replied,
"Yeah, and we got some money." Connell also talked to Virgie Green who said that "Red" Green
(Frankie's sister) was overheard telling someone that Kenneth Green (Frankie's older brother),
Nicholas Edwards, and Rodney Green (Frankie's younger brother) had robbed Westmoreland. 
          Sheriff Wilson and Ranger Connell presented this information to the grand jury which
returned indictments against Kenneth Green, Nicholas Edwards, and Frankie Green on December
12. Connell arrested Frankie Green on December 13 under a capias issued by the district clerk
based on the indictment. On December 20 Frankie signed a confession that was later introduced
into evidence at his trial.
INDICTMENT
          The indictment alleged that, while in the course of committing theft of property and with
intent to obtain and maintain control of the property, Frankie Green intentionally and knowingly
caused bodily injury to Percy Westmoreland "and said PERCY WESTMORELAND was then and
there older than 64 years of age." Green never objected to the form or substance of the indictment
before the trial commenced. However, when the prosecutor told the venire during voir dire that
the indictment charged aggravated robbery, Green objected to the statement on the ground that the
indictment only charged robbery. His objection was that the statute creating the offense of
aggravated robbery requires the victim to be "65 years of age or older" before age itself becomes
an aggravating factor. See Tex. Penal Code Ann. § 29.03(a)(3)(A) (Vernon Supp. 1992). The
court overruled his objection.
          Green's seventh point is that the court erred when it overruled his objection to the State's
voir dire and allowed him to be tried for aggravated robbery when the indictment alleged only
robbery. Section 1.06 of the Penal Code provides that a person attains a specified age on his
birthday. Id. § 1.06 (Vernon 1974). Thus, a person is sixty-fours years of age until the day of
his sixty-fifth birthday. Alleging in the indictment that Westmoreland was "older than 64 years
of age" on the date of the robbery was thus legally equivalent to alleging that he had already
attained his sixty-fifth birthday. See id.; Phillips v. State, 588 S.W.2d 378, 380 (Tex. Crim. App.
1979). He could not be older that sixty-four without being at least sixty-five. Accordingly, the
allegation in the indictment charged Green with aggravated robbery based on age of the victim as
the aggravating factor. Point seven is overruled. 
BATSON
          The first point is based on the overruling of Green's Batson objection. See Batson v.
Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.E.2d 69 (1986); Tex. Code Crim. Proc. Ann. art.
35.261 (Vernon 1989). Green, who is black, objected to the seating of the jury on the ground that
the State had used its peremptory challenges to strike three of the four blacks from the jury:
Margaret Heggins (number 5), Aaron Buckner (number 14), and McKinney Davis (number 30). 
Ida Birdine (number 1) served on the jury. After listening to the prosecutor's reasons, the court
impliedly found that the strikes were not racially based and overruled the objection. The standard
of review is whether the implied findings are clearly erroneous. See Hill v. State, 827 S.W.2d
860, 865 (Tex. Crim. App. 1992).
          The State first argues that Green never made a prima facie showing of racial
discrimination. This issue became moot after Green made his Batson objection, the prosecutor
stated his reasons for the strikes, and the court ruled on the objection. See id.  
          The prosecutor said that he struck Margaret Heggins for "two reasons in combination": (1)
she had a hard time visualizing a situation in which she could assess the maximum sentence—99
years or life; and (2) her strong personality. Green argued that a white juror had expressed the
same problem with assessing the maximum punishment but was not stricken by the State.
          Under the prosecutor's questioning, Heggins admitted that she would have difficulty
assessing the maximum sentence. Although she could consider the maximum sentence, she said
she would find it "tough" to assess. She said that she would act "according to the circumstances." 
When asked by the defense whether she could assess the maximum sentence if the facts justified
it, she answered, "I just don't know what it would be." Finally, however, she told the defense
that she could consider and assess the maximum punishment if the facts justified it.
          Heggins repeatedly expressed reservations about considering and assessing the maximum
range of punishment. Striking her for this ambivalence is a facially race-neutral reason. That she
was ultimately "rehabilitated" by the defense did not mean the State had to accept her ambivalent
views. See Vargas v. State, No. 1507-89, slip op. at 5 (Tex. Crim. App., June 24, 1992). The
reason behind a peremptory strike does not have to rise to the level of a challenge for cause to be
considered legitimately race-neutral. Batson, 106 S.Ct. at 1723.
          Green pointed out that another juror, Sherry Johnson, expressed a similar concern about
assessing the maximum punishment but was not stricken by the State. He insists that the only
difference between the two is that Johnson is white and Heggins is black. The State argues,
however, that Johnson's ambivalence about assessing the maximum punishment was overcome,
in the prosecutor's mind, by her longstanding, friendly acquaintance with Westmoreland and that
Johnson was thus not stricken for this reason. A strike does not automatically become racially
based just because the prosecution failed to strike another juror who shares the same characteristic
as a stricken minority juror. The factors listed in Keeton v. State, 749 S.W.2d 861, 867 (Tex.
Crim. App. 1988), which tend to indicate disparate treatment of minority jurors, do not control
the trial court's decision on whether a strike is racially based. Vargas, No. 1507-89, slip op. at
4. These factors are to be used by an appellate court as an analytical tool to determine whether
the court's findings are clearly erroneous, not to evaluate the prosecutor's credibility. Young v.
State, 826 S.W.2d 141, 152-53 (Tex. Crim. App. 1992) (on rehearing). 
          In any event, the prosecutor gave another independent race-neutral reason for striking
Heggins—her strong personality. Because this explanation is not quantifiable and the trial judge
personally observed the demeanor of the prospective jurors, we must defer to his decision that this
was not a pretext for striking Heggins for a race-based reason. See Vargas, No. 1507-89, slip op.
at 4. Even if the first reason for the strike—reservations about assessing the maximum penalty—is
called into question by the failure to strike a white juror with a similar concern, the second
independent reason—strong personality—stands untainted as a basis for the strike. Under the
circumstances, the court's finding is not clearly erroneous. See Hill, 827 S.W.2d at 865.
          The State struck Buckner, the prosecutor said, because the "tone of his voice" indicated
that he knew the victim and that "it may not have been a pleasant knowledge . . . a pleasant
relationship." The court noted for the record that Buckner did have an "inflection in his voice"
when he answered the question about knowing the victim, but the court declined to further
characterize the inflection. This is another facially race-neutral explanation that requires us to
defer to the trial judge's implied finding that the reason given was not pretextual. See Vargas, No.
1507-89, slip op. at 4. Whether the prosecutor misinterpreted the nuance of the inflection is not
for us to judge but lies instead within the peculiar purview of the court who heard it. See id. 
          Finally, Green complains that the State struck McKinney Davis for impermissible reasons:
he was unresponsive and inattentive during voir dire. These are both race-neutral reasons on their
face that have been upheld as legitimate explanations for peremptory strikes. See Moore v. State,
811 S.W.2d 197, 199-200 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd). We again defer to
the trial court's finding made after he observed the juror's demeanor and response. See Vargas,
No. 1507-89, slip op. at 4. Moreover, the court and the parties agreed that, even if Davis had not
been peremptorily stricken, he would not have served on the jury due to his location on the jury
panel and the number of double-strikes. Under the circumstances, Green could not have been
harmed by the strike against Davis. See Tex. R. App. P. 81(b)(2).
          We hold that the court's findings and conclusions are not clearly erroneous. See Hill, 827
S.W.2d at 865. Point one is overruled. 
CONFESSION
          Points two through six relate to Green's confession. Essentially, he contends in points two,
three, and four that the court should have suppressed his confession because he did not knowingly
and intelligently waive his right to counsel or his right to remain silent and was never admonished
of the dangers and disadvantages of self-representation.
          Before turning to the merits of his points, we briefly examine the basic rules for
determining the admissibility of a confession. To be admissible, a confession must be voluntarily
given and obtained in compliance with Miranda. Ochoa v. State, 573 S.W.2d 796, 801 (Tex.
Crim. App. 1978). Whether it is voluntarily given is determined from a totality of the
circumstances surrounding its taking. Barton v. State, 605 S.W.2d 605, 607 (Tex. Crim. App.
[Panel Op.] 1980). At a hearing on the voluntariness of a confession, the court is the fact-finder
and the exclusive judge of the credibility of the witnesses and the weight to be given their
testimony. Humphrey v. State, 646 S.W.2d 949, 951 (Tex. Crim. App. 1983). The standard of
review is abuse of discretion. Barton, 605 S.W.2d at 607.
          Ranger Bob Connell said he took Green's confession only after reading him his Miranda
rights. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Green
had also been given two magistrate's warnings prior to confessing. Connell said that Green
acknowledged that he understood his rights and never invoked his right to remain silent or request
counsel. Green had not then retained an attorney or been furnished appointed counsel. Connell
also denied ever threatening Green or making him any promises to obtain his confession. 
          Green introduced documentary evidence at the suppression hearing indicating that he is
mentally retarded (54 IQ), involved in special education, and functions at the third-grade skill
level. Dr. Dickerson, a psychologist, concluded that Green suffers from diminished judgment,
insight, and ability to apply knowledge to new situations. The evidence also showed, however,
that his "street smarts" exceeded his IQ level. Green asks us to hold as a matter of law that an
accused cannot knowingly waive his rights when evidence of mental retardation and limited
understanding is unrefuted and the evidence does not show either an affirmative waiver of rights
or that his rights were explained prior to taking his confession.
          Evidence of mental retardation and mental impairment is a factor to be considered by the
court in determining from the totality of the circumstances whether the accused voluntarily and
knowingly waived his rights prior to confessing. Bizzarri v. State, 492 S.W.2d 944, 946 (Tex.
Crim. App. 1973). The question is whether the accused's mental impairment is so severe that he
is incapable of understanding the meaning and effect of his confession. Casias v. State, 452
S.W.2d 483, 488 (Tex. Crim. App. 1970). This is usually a question for the fact-finder. Bell v.
State, 582 S.W.2d 800, 809 (Tex. Crim. App. 1979).
          Green's argument that unrefuted evidence of mental retardation precludes a knowing and
voluntary waiver of rights has already been rejected. See id. at 808-09. One cannot say that the
evidence at the suppression hearing conclusively established that Green's mental impairment was
so great that he could not understand and knowingly waive his rights. Accordingly, the court had
to determine from all the circumstances surrounding the taking of the confession whether it was
voluntarily given in compliance with Miranda.
          Article 1.051(a) provides that a defendant is entitled to counsel in an "adversarial judicial
proceeding." Tex. Code Crim. Proc. Ann. art. 1.051(a) (Vernon Supp. 1992). Moreover,
article 1.051(g) provides:
If a defendant wishes to waive his right to counsel, the court shall advise him of the
dangers and disadvantages of self-representation. If the court determines that the waiver
is voluntarily and knowingly made, the court shall provide the defendant with a statement
substantially in the following form, which, if signed by the defendant, shall be filed with
and become part of the record of the proceedings: [form of the written statement is given].

Id. at art. 1.051(g). Green contends in point three that Connell obtained his confession in
violation of this provision and his constitutional right to counsel. 
          Green's right to counsel under the Sixth Amendment attached upon his indictment. See
U.S. Const. amend. VI. Undisputed evidence shows that two magistrates had warned him of his
Miranda rights before he confessed. This was legally sufficient to advise him of the "dangers and
disadvantages" of self-representation during post-indictment questioning. See Patterson v. Illinois,
487 U.S. 285, 108 S.Ct. 2389, 2398, 101 L.Ed.2d 261 (1988). Thus, the portion of article
1.051(g) that required a court to advise Green of the dangers and disadvantages of self-representation before he could waive his right to counsel was twice complied with. See Tex.
Code Crim. Proc. Ann. art. 1.051(g). He cannot complain about the failure to obtain a written
waiver of his right to counsel because he did not object on that ground in the trial court. See Tex.
R. App. P. 52(a); Williams v. State, 774 S.W.2d 703, 705-06 (Tex. App.—Dallas 1989, pet.
ref'd).
          Accordingly, the court did not abuse its discretion when it found that Green knowingly
waived his right to counsel when he confessed after receiving a Miranda warning of his right to
counsel. See Patterson, 108 S.Ct. at 2398. Points two, three, and four are overruled.
          In points five and six, Green contends the court should have suppressed the confession
because it was obtained as a result of an illegal arrest. He argues that his arrest was illegal
because it was made without probable cause and under a capias issued before the court set or
denied bail. Green charges that Sheriff Wilson and Ranger Connell, knowing that they did not
have probable cause to obtain an arrest warrant prior to indictment, presented the facts they had
gathered to the grand jury and obtained an indictment that allowed them to arrest him on a capias
issued on the indictment. Consequently, he argues that the capias was "tainted" with the same lack
of probable cause, which made his arrest illegal. 
          We cannot review the sufficiency of the evidence supporting an indictment or question
whether the grand jury had probable cause to indict. See Polk v. State, 749 S.W.2d 813, 817
(Tex. Crim. App. 1988). Thus, whether the State had probable cause to obtain an arrest warrant
prior to indictment is immaterial, and any lack of probable cause for his arrest before indictment
did not automatically make his arrest illegal after indictment. 
          Instead, the validity of Green's arrest depends upon the capias issued by the district clerk
under article 23.03: "(a) A capias shall be issued by the district clerk upon each indictment for
felony presented, after bail has been set or denied by the judge of the court." See Tex. Code
Crim. Proc. Ann. art. 23.03(a) (Vernon 1989). Green first contends that the capias was defective
because it was not issued by an impartial magistrate. This contention is rejected because, clearly,
the capias was issued by the proper officer—the district clerk—following the indictment. 
          The district clerk testified that she issued the capias upon the return of the indictment
without the judge, to whose court the indictment was returned, ever setting or denying bail. Green
contends his arrest was illegal because the district clerk could issue the capias only after the court
had set or denied bail. We interpret the phrase, "after bail has been set or denied by the judge of
the court," as being a directory requirement only and not a mandatory requirement that, if not
strictly followed, would make the capias void or defective. Accordingly, we hold that Green was
arrested under a valid capias and that his arrest was thus not illegal. Points five and six are
overruled.
          Having overruled all points relating to the admissibility of the confession, we hold that the
court did not abuse its discretion in admitting it into evidence.
HEARSAY
          Sheriff Wilson of Leon County testified during the trial that Green, who was being held
in Madison County, sent word through the Madison County Sheriff's office that Green wanted to
talk to him. The court overruled Green's hearsay objection and admitted the testimony not for the
truth of the matter stated but for the limited purpose of showing what prompted the action that
Sheriff Wilson subsequently took. After the objection was overruled, Wilson said that he sent a
deputy to Madison County to transport Green to the Leon County jail, where he and Ranger
Connell briefly talked with him and Connell then obtained the confession. Green's eighth point
is based on the overruling of his hearsay objection.
          Sheriff Wilson's testimony related hearsay within hearsay: He was told by the Madison
County Sheriff's office that Green said he wanted to talk to him. Double hearsay is admissible,
however, if each part of the combined statements fit within an exception to the hearsay rule. Tex.
R. Crim. Evid. 805. One of the exceptions in Rule 803 is for a statement of the declarant's
present state of mind—usually of his intent or plan—offered to prove that he subsequently acted
in accordance with his state of mind. Id. at 803(3). This exception is widely recognized by Texas
courts and remains undisturbed by the Texas evidentiary rules. S. Goode, O. Wellborn & M.
Sharlot, Guide To The Texas Rules Of Evidence: Civil And Criminal § 803.7 (Texas
Practice 1988) [hereinafter Texas Practice]. In fact, Texas precedent allows state-of-mind
declarations to be admitted to prove the joint conduct of the declarant and another. Porter v.
State, 86 Tex. Crim. 23, 215 S.W. 201, 210-11 (1919) (Morrow, J., concurring). Rule 803(3)
should, therefore, be interpreted as permitting this practice. Texas Practice § 803.7.
          The Rule 803(3) exception is applicable here because the declaration of the Madison
County Sheriff's deputy to Sheriff Wilson and Green's declaration both fit within the exception. 
Each declaration is admissible to prove that Sheriff Wilson, the Madison County Sheriff's office,
and Green acted jointly in conformance with the stated intent or plan of future conduct. See
Porter, 215 S.W. at 210-11.
          Assuming, however, that the court erred when it admitted Wilson's testimony over the
hearsay objection, the question is whether it would be harmless. See Tex. R. App. P. 81(b)(2). 
Green argues that the hearsay evidence was devastating to his claim that the confession was not
voluntarily given. He contends the jury would have reasonably believed he would not have sent
word that he wanted to talk to Sheriff Wilson unless he wanted to voluntarily confess. None of
the evidence relating to the voluntariness of the confession even intimated that it was obtained by
force, threats, promises, or other inducements. Rather, Green claimed that it was involuntarily
given because he did not knowingly and intelligently waive his rights. Under the circumstances,
admitting evidence that he asked to talk to Sheriff Wilson before confessing would have no logical
relationship to whether he knew and understood his rights before he confessed, and the jury would
not have interpreted it otherwise. Isolating the error against the record as a whole, we find that
the error would not have contributed to his guilt or punishment beyond a reasonable doubt. See
id.; Harris v. State, 790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989). We overrule the eighth
point.
SUFFICIENCY OF THE EVIDENCE
          Green questions in point nine whether the evidence is sufficient to support his conviction. 
He argues that his confession did not show that he even committed a crime. His confession
contained these admissions:
          •        Frankie Green, his brother (Kenneth), and Nicholas Edwards discussed robbing
Westmoreland shortly before the crime occurred.
          •        Frankie and Edwards "decided to do it" on the night of the robbery.
          •        Frankie, Edwards, and Rodney Green (Frankie's younger brother) drove to
Westmoreland's home and waited for him to arrive; Frankie hid by the barn,
Edwards hid near the carport, and Rodney remained near the street as a "lookout."
          •        Westmoreland soon arrived and started walking toward his house carrying a sack,
at which time Edwards struck him in the head with a piece of pipe that Edwards
had brought with him from Kenneth's house.
          •        Edwards grabbed the sack from Westmoreland, which contained money, checks,
and food stamps, and ran to where Frankie was hiding; Frankie and Edwards then
ran from the scene looking for Rodney, who had apparently left.
          •        Frankie and Edwards left the sack taken from Westmoreland in an "old pickup
truck" when they could not find Rodney and then went to the "Flats" where they
met Kenneth.
          •        Edwards told Kenneth about the robbery, and Kenneth used his car to drive Frankie
and Edwards to get the sack from the old pickup.
          •        Kenneth then drove Frankie, Edwards, and Rodney to Frankie's house where they
counted and divided the money between the four of them.
          •        Frankie received $2,000 from the cash taken in the robbery.
Green contends that, other than his confession showing he knew about the robbery in advance and
was present at the scene, he never admitted doing any act that made him a party to the offense.
          A person is a party to an offense if, "acting with intent to promote or assist the commission
of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit
the offense." Tex. Penal Code Ann. §7.02(a)(2) (Vernon 1974). Presence of the accused at the
crime scene, coupled with proof of a prior agreement that the offense should be committed, is
evidence that the accused both encouraged and intended to promote the commission of the offense. 
Mayfield v. State, 716 S.W.2d 509, 514 (Tex. Crim. App. 1986). Green admitted discussing the
robbery with Edwards, agreeing with Edwards "to do it," hiding at the scene while Edwards
robbed Westmoreland, fleeing the scene with Edwards, hiding the money in the old pickup, and
receiving a large share of the loot. Thus, the admissions in his confession that he agreed to the
robbery and was present at its commission were, standing alone, sufficient to establish his criminal
responsibility as a party. See id. 
          Viewing the admissions and corroborating evidence in the light most favorable to the
verdict, we hold that any rational fact-finder could, beyond a reasonable doubt, find all of the
elements of the offense and Green's guilt as a party. Rivera v. State, 808 S.W.2d 80, 91 (Tex.
Crim. App. 1991), cert. denied, ——U.S.——, 112 S.Ct. 279, ——L.Ed.2d—— (1991); Tex.
Penal Code Ann. § 7.02(a)(2). Point nine is overruled.
CHARGE
          The charge on guilt-innocence contained this application paragraph:
Now, if you find from the evidence beyond a reasonable doubt that . . . Nicholas
Edwards did intentionally or knowingly, while in the course of committing theft of
property, and with intent to obtain and maintain control of said property, cause bodily
injury to Percy Westmoreland and said Percy Westmoreland was then and there older than
sixty-four years of age, and that . . . Frankie Green, acted with intent to promote or assist
the commission of the offense by Nicholas Edwards by encouraging, aiding, or attempting
to aid Nicholas Edwards to commit the aforesaid offense, by entering into an agreement
with Nicholas Edwards to rob Percy Westmoreland and being present when Nicholas
Edwards robbed Percy Westmoreland, or by fleeing the scene of the robbery and assisting
Nicholas Edwards in fleeing the scene of the robbery and the defendant, Frankie Green,
knew that Nicholas Edwards had robbed Percy Westmoreland, or entered into an
agreement with Nicholas Edwards to rob Percy Westmoreland and assisted Nicholas
Edwards in hiding the proceeds of the robbery[,] then you will find the defendant, Frankie
Green, guilty of aggravated robbery as charged in the indictment.

          Green's tenth and eleventh points question whether the evidence is sufficient to authorize
his conviction as a party on the three alternate theories outlined in the charge: (1) agreeing to the
robbery and then being present at the scene; (2) agreeing to rob Westmoreland and assisting
Edwards in fleeing the scene, knowing that the robbery had occurred; or (3) agreeing to rob
Westmoreland and, knowing that the crime had occurred, assisting Edwards in hiding the proceeds
of the robbery. Green admitted that he and Edwards agreed to the robbery—i.e., "to do it"—and
that he was present at the scene. As already noted, this was sufficient evidence from which the
jury could reasonably infer that he acted as a party. See Mayfield, 716 S.W.2d at 514.
          Moreover, circumstantial evidence will support a charge on parties, and the jury can
reasonably infer the accused's guilt as a party from such evidence. Beardsley v. State, 738
S.W.2d 681, 684 (Tex. Crim. App. 1987). In considering whether the accused acted as a party,
the court and jury may consider events occurring before, during, or after the offense. Id.
          Green admitted that he:
          •        discussed the robbery with Edwards before it occurred.
          •        agreed with Edwards "to do it" on the night of the robbery.
          •        accompanied Edwards to the scene and hid while they waited for Westmoreland to
arrive.
          •        accompanied Edwards from the scene after Edwards hit Westmoreland in the head
and took his money.
          •        accompanied Edwards while they hid the money in an old pickup truck.
          •        went with Edwards and Kenneth Green to retrieve the money from the old pickup.
          •        participated with Edwards, Kenneth, and Rodney Green in counting and dividing
the money.
          •        received $2,000 from the proceeds of the robbery.
          There was no direct evidence that Green assisted Edwards in fleeing the scene or hiding
the loot. The jury could reasonably infer from the circumstantial evidence, however, that Green
and Edwards acted under a common design and plan that included assisting each other in fleeing
the scene and hiding the loot in the old pickup. See Beardsley, 738 S.W.2d at 684. All three
alternate theories were therefore supported by the evidence. Points ten and eleven are overruled.
IMPEACHMENT
          Nicholas Edwards, who was called as a witness by the State, denied on direct examination
that Green knew Westmoreland was going to be robbed when they went to his home. The
prosecutor then asked him, "Do you remember telling me something different yesterday?" After
the court overruled defense objections that the prosecutor was engaging in improper impeachment
and placing the prosecutor's own credibility in issue, Edwards answered "No." The court then
refused to allow the State to prove up the allegedly prior inconsistent statement. In point twelve,
Green argues that the court erred when it allowed the prosecutor to inject his own personal
knowledge and opinion into the trial. He contends that the jury was placed in the position of
having to decide who was telling the truth—the prosecutor or Edwards.
          The credibility of any witness may be attacked, even by the party who called him. Tex.
R. Crim. Evid. 607. A witness' prior inconsistent statement is admissible for impeachment. Id.
at 612(a). Thus, the court did not err when it allowed the prosecutor to ask Edwards whether he
had made a prior inconsistent statement. See id. Assuming, however, that error occurred, Green
could hardly have been harmed by Edward's denial of any prior inconsistent statement, especially
when the State was never allowed to prove its alleged contents and in light of Green's own
admission that he and Edwards agreed to the robbery before they went to Westmoreland's house. 
Any error would have been harmless beyond a reasonable doubt. See Tex. R. App. P. 81(b)(2). 
Point twelve is overruled.
PUNISHMENT
          Green has several points relating to the punishment stage. His first complaint is that the
court erred when it refused to instruct the jury, as he requested, that it could not assess his
punishment by considering the law of parties. He relies on Green v. State, 682 S.W.2d 271, 287
n.4 (Tex. Crim. App. 1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794
(1985), in which the court held that, although the jury is entitled to consider on punishment all of
the evidence adduced at the guilt phase, the court must nevertheless instruct the jury—if
requested—that it cannot consider the law of parties in assessing the death penalty. This is because
the issues the jury must answer in assessing punishment in a capital case focus solely on the
defendant's individual conduct, not that of a co-actor. Id. at 287; Tex. Code Crim. Proc. Ann.
art. 37.071(b), (e) (Vernon Supp. 1992). Thus, the instruction is necessary in a capital case to
expressly restrict the jury's view of the evidence to the defendant's own conduct. 
          Green argues that he is entitled to the same instruction in a non-capital case. Nothing in
article 37.07, relating to the punishment hearing in non-capital cases, restricts the jury's
consideration to the defendant's own conduct in assessing punishment. Tex. Code Crim. Proc.
Ann. art. 37.07 (Vernon 1981 & Supp. 1992). In fact, the jury has always been allowed to
consider all of the facts and circumstances surrounding a non-capital offense in assessing
punishment. Williams v. State, 535 S.W.2d 637, 639 (Tex. Crim. App. 1976). Green's requested
instruction, if given, would abrogate the general rule in a non-capital case without any statutory
imperative for doing so. We hold that he was not entitled to the instruction. Point thirteen is
overruled.
          At the beginning of the punishment phase, the State re-offered all of the evidence from the
guilt stage. Green objected to the State re-offering Nicholas Edward's testimony, including the
out-of-court statement used for impeachment, on the ground that the prosecutor then believed that
Edwards had testified falsely. (The prosecutor admitted at the hearing on the motion for a new
trial that he believed Edwards had lied). The court, however, overruled the objection to Edward's
testimony being re-offered on punishment and later denied the motion for a new trial containing
the same complaint.
          Green's fourteenth and fifteenth points are based on the contention that the court
improperly allowed the State to re-offer Edward's perjured testimony on punishment. Green
confuses the duty of a prosecutor not to knowingly offer perjured testimony and the admissibility
of testimony that, in hindsight, the prosecutor may not believe was entirely truthful. The record
does not reflect or even hint that the State knowingly offered perjured testimony.
          Evidence presented during the guilt stage is automatically before the jury on punishment
regardless of whether it is formally re-offered by the State. Wright v. State, 468 S.W.2d 422, 425
(Tex. Crim. App. 1971). Thus, the prosecutor's re-offering of evidence from the guilt phase had
no legal effect. Whether Edwards had testified truthfully or not was for the jury to determine, not
for the prosecutor, and the prosecutor's personal hindsight opinion of Edwards' credibility did not
make his testimony inadmissible on punishment. Points fourteen and fifteen are overruled.
          The court included this instruction in the charge on punishment without any objection from
Green:
Under the law applicable in this case, the defendant, if sentenced to a term of
imprisonment, may earn time off the period of incarceration imposed through the award
of good conduct time. Prison authorities may award good conduct time to a prisoner who
exhibits good behavior, diligence in carrying out prison work assignments, and attempts
at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take
away all or part of any good conduct time earned by the prisoner.

(Emphasis added). Article 37.07, section 4(a), requires the court to give this instruction in a
felony jury trial "if the offense of which the jury has found the defendant guilty is listed in Section
3g(a)(1), Article 42.12." Tex. Code Crim. Proc. Ann. arts. 37.07, § 4(a), 42.12, § 3g(a)(1)
(Vernon Supp. 1992). Aggravated robbery, the offense of which Green was convicted, is listed
in section 3g(a)(1)(D). See id. § 3g(a)(1)(D). 
          Green now contends the court erred when it gave the instruction because it conflicts with
section 8(c)(11) of article 42.18, which prohibits a person serving a sentence for aggravated
robbery from being released to mandatory supervision. See id. at art. 42.18, § 8(c)(11). Nor can
good-conduct time be considered in determining when a prisoner sentenced for aggravated robbery
is eligible for parole. Id. § 8(b)(3).
          Apparently, Green's concern is that the instruction misled the jury into believing that any
good-conduct time he might earn would be credited to his sentence when, having been convicted
of aggravated robbery, good conduct could not be considered in determining either his parole date
or his eligibility for mandatory supervision. This would have caused the jury, he apparently
argues, to increase his sentence to compensate for the good-conduct credit.
          Assuming that giving the instruction constituted an error in the charge, we must determine
whether it resulted in such egregious harm that Green did not receive a fair and impartial trial. 
See Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (on rehearing). This test is
used when the error in the charge is not objected to at trial. Id. The degree of harm is determined
by considering the entire charge, the weight of the probative evidence, the contested issues,
arguments of the parties, and any other relevant information revealed by the record. Id.
          Informing the jury of good-conduct time is now expressly permitted by the constitution. 
Tex. Const. art. IV, § 11(a). The instruction given by the court deals in possibilities, not
probabilities or absolutes. It merely informed the jury that prison authorities may give Green
good-conduct time if he earns it, but that he may lose it if he misbehaves. How one can be
egregiously harmed by such an instruction is not readily apparent. If the instruction could have
caused the jury to impose a heavier sentence than it would have otherwise to offset any good-time
credit, as Green argues, then that prospect is inherent in the instruction itself, regardless of
whether it is properly or improperly given. 
          Considering the record as a whole, the charge, the probative evidence, and the rather
moderate sentence assessed by the jury, we hold that giving the instruction in this instance, when
good-conduct time earned may have been of no benefit to Green, did not prevent him from
receiving a fair and impartial trial. See Almanza, 686 S.W.2d at 171. Points sixteen and
seventeen are overruled. 
          We affirm the judgment.
                                                                                 BOB L. THOMAS
                                                                                 Chief Justice
Before Chief Justice Thomas, 
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed September 9, 1992
Publish