# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00339-CR

**Jonathan Wayne Scott, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. D-1-DC-06-300448, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Jonathan Wayne Scott of the offense of burglary of a habitation. *See* Tex. Penal Code Ann. § 30.02 (West 2003). Punishment was assessed at forty years' imprisonment. In three points of error, Scott challenges the sufficiency of the evidence supporting his conviction, asserts that the district court abused its discretion in denying his motion for new trial, and claims ineffective assistance of counsel. Also, in a supplemental brief, Scott challenges the district court's subject-matter jurisdiction on the basis that the indictment failed to charge him with an offense. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that, on February 22, 2006, the complainant, Linda Jones, during a lunchtime trip to her house, discovered that her garage door "was broken off of the rails and hanging halfway down." Jones testified that the garage door had been "secured" when she left for

work that morning.[1] Jones also observed "a strange vehicle" parked "right in front of the garage in the driveway." She described this vehicle as a "red SUV, minivan type vehicle." Jones parked behind the vehicle, and, as she got out of her car, observed a man come out of the garage. Jones described this man as "5'10", six feet, somewhere in there, slender, blue jeans. It was a black man, clean shaven." At trial, Jones identified this man as the defendant, Scott.

Jones testified that Scott approached her car and said, "Hi. How are you doing?" Jones looked at him and said, "What are you doing here?" Scott told Jones he was there to "pick up some stuff" for a "Mr. James Anderson." Jones did not know anyone by the name of James Anderson. She asked Scott, "What stuff?" According to Jones, Scott told her, "Well, it's from a carpet job." Jones testified that she "knew this was definitely off, because the house ha[d] not had carpet in it since it was built in 1937." Scott added, "This is the address he told me to come to." Jones replied, "Well, what address did he tell you?" Rather than give Jones a physical address, Scott turned around and looked at the street sign in the corner of the yard, and he said, "Corner of Ellingson and Clarkson and last house on the right." Scott told Jones that she could call "Mr. Anderson" if she liked. Scott approached his vehicle and opened the driver's side door.

Jones dialed 911. As Jones was reading the van's license number to the 911 operator, Scott asked her, "Who are you talking to?" Jones testified that when she did not respond, Scott said, "Oh, man," and got in his vehicle and drove away. Despite the fact that Jones's car was parked behind his van, Scott, according to Jones, was able to get out by "backing and maneuvering

---

[1] Jones testified that she had secured the garage door by using "big pieces of wood" that she "propped up against it because the lock on it was broken."

2

to where he was able to turn and go across the other side of the driveway, and drove across [her] next-door neighbor's yard to get in the street and leave."

Before the police arrived, Jones entered her house through the front door and noticed that it was unlocked. Jones testified that she had locked the door before leaving for work that day. As Jones searched her house, she discovered that several valuable items were missing, including her television set and DVD player from the living room, her jewelry box from the bedroom, her flatware from the kitchen, and her power tools from the garage. Also, speakers and a cable box were "scattered on the floor." Several days later, police officers apprehended Scott in or near the red van. The van was inventoried, and several items belonging to Jones were discovered in the vehicle.

At trial, Scott suggested variously that another person, Stephen May, a white male, had actually committed the offense; that Scott had loaned his van to another African-American male who committed the offense; or that Scott otherwise had been duped into participating in the burglary. At the time of trial, May was in the custody of the Travis County Sheriff's Office. He had been convicted of the offense of burglary of a habitation committed on April 27, 2006. While in jail, May had written and signed three statements in which he admitted to "manipulating" Scott and "utilizing his vehicle (Dodge sport van) to engage in criminal activity without his knowledge or consent." In these "confessions," May took "sole responsibility" for the burglary and asked that the State dismiss the charges against Scott.

May testified at trial. He explained that he and Scott had been "housed on the same unit at the Travis County Jail." May admitted to writing and signing the confessions but testified that they had been false. The State asked May why he made these false statements. May testified,

3

"Sir, at the time, I was forced and coerced by physical harm and threats to my family members."

When asked who made these threats to him, May answered, "Mr. Jonathan Scott."

Michael Nichols, an acquaintance of Scott's who, at the time of trial, was incarcerated for fraud and forgery, also testified for the defense. Nichols testified that Scott let him and others use Scott's van on several occasions. Nichols also testified that, on two occasions, he saw an associate of Scott's who was a tall, dark-headed, white male, approximately thirty years old. However, Nichols did not remember this person's "name per se." Scott's counsel asked Nichols, "Did you ever see Mr. Scott lend his van to that person?" Nichols answered, "I couldn't say for sure, so I wouldn't want to venture a guess."

Scott was indicted for burglary by entering a habitation and committing or attempting to commit theft. *See* Tex. Penal Code Ann. § 30.02(a)(3).[2] The jury found Scott guilty as charged in the indictment. Sentencing was before the district court. Scott pleaded true to enhancement paragraphs alleging prior convictions for the offenses of theft, unauthorized use of a motor vehicle, and burglary of a habitation. After hearing evidence, the district court sentenced Scott to forty years' imprisonment. Scott subsequently filed a motion for new trial. The district court denied the motion. This appeal followed.

---

[2] As we will discuss below, Scott draws a number of implications from the fact that the caption on the indictment referred to "Burglary – Habitation Entry with Commission of Theft F2 30.02.1.a," which he construes as a misprint of Tex. Penal Code § 30.02(a)(1). However, as we will explain, the body of the indictment alleges the elements under section 30.02(a)(3), and it is the body of the indictment that controls.

**ANALYSIS**

**Legal sufficiency**

We will first address Scott's third point of error, in which he asserts that the evidence is legally insufficient to support his conviction. He claims that "only two things" could connect him to the offense—his presence at the house, and the stolen property found in his vehicle. According to Scott, neither of these circumstances is legally sufficient to sustain his conviction.

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

A person commits the offense of burglary of a habitation if, without the effective consent of the owner, he enters a building or habitation and commits or attempts to commit a felony, theft, or an assault. *See* Tex. Penal Code Ann. § 30.02(a)(3).

The evidence presented by the State to prove that Scott committed the offense included the following:

- Scott was found at Jones's residence when no one else was present.

- Jones testified that the garage door "was broken off of the rails and hanging halfway down." She testified that it had been "secured" earlier in the day.

- When Jones asked Scott to explain why he was there, Scott told her that he was there to "pick up stuff" for a "Mr. James Anderson" involving a "carpet job." Jones did not know anyone named James Anderson, and her house did not have carpet.

- When Jones asked Scott to tell her the address of where he was supposed to be, Scott did not give her a physical address.

- When Jones called 911, Scott fled the scene, driving through her neighbor's yard to get away.

- Jones testified that her front door was unlocked, even though she had earlier locked it.

- Immediately after Scott drove away, Jones discovered many valuable items missing from her house. Other items in her house were "scattered on the floor."

- Many of Jones's missing items were found in Scott's van upon his apprehension several days later.

Viewing the above evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense beyond a reasonable doubt.

6

We overrule Scott's third point of error.

**Motion for new trial**

In his second point of error, Scott contends that the district court abused its discretion in denying his motion for new trial.[3] In his motion, Scott contended that there was "newly discovered evidence" that Stephen May had, in fact, committed the offense. This evidence consisted of an affidavit by Robert Mitchell, an inmate at the Travis County Jail, and testimony by Calvin Williams, also an inmate.

Robert Mitchell averred that he knew Stephen May in jail, and that May was a "fearless, violent person." Mitchell further averred:

> [May] was extremely anxious though, about his involvement in Mr. Scott's trial. While in jail with me, Mr. May talked excessively about the criminal case involving Jonathan Smith, who I did not know. He paced his cell and stated numerous times that he did not want to testify at Mr. Scott's trial, he stated that he wanted to take the 5th. Mr. May also stated to me that he should take responsibility for the crime that Mr. Scott was charged with, but that he (Mr. May) would get more time if he testified for Mr. Scott.

Calvin Williams testified that he knew both Scott and May from prison. He further testified that May admitted to him that he was "responsible" for the offense:

---

[3] After the district court denied Scott's motion, Scott filed a motion to reconsider. At the hearing on the motion to reconsider, the State objected to the reconsideration, arguing that the district court did not have jurisdiction to reconsider its denial of the motion for new trial. The district court overruled the objection. The record reflects that the district court's reconsideration of the motion occurred within 75 days after the district court imposed sentence. Within that time period, the district court retained jurisdiction to reconsider its ruling on the motion for new trial, for any reason. *See Awadelkariem v. State*, 974 S.W.2d 721, 728 (Tex. Crim. App. 1998); *Stepan v. State*, 244 S.W.3d 642, 645-46 (Tex. App.—Austin 2008, no pet.).

7

Q:    Did you and Mr. May talk about the Jonathan Scott trial?

A:    Yes, we did.  He didn't tell me the specific name of the person, but it was obvious.

Q:    And did Mr. May indicate that he was going to take the Fifth?

A:    Yes, he did.

Q:    Did you ask Mr. May why he was going to take the Fifth?

A:    Yes, ma'am.  He said it was because he was the person who was responsible. He didn't tell me what the crime was.  He just said that it was his.


At the conclusion of the hearing, the district court denied Scott's motion for new trial, finding that "the evidence is cumulative, that the evidence is not credible and that this evidence would not have changed the verdict of the jury."

Article 40.001 of the code of criminal procedure provides that "a new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." Tex. Code Crim. Proc. Ann. art. 40.001 (West 2006).  A trial court's decision on whether to grant a new trial based on newly discovered evidence will not be reversed absent an abuse of discretion. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002); *Marinos v. State*, 186 S.W.3d 167, 178 (Tex. App.—Austin 2006, pet. ref'd).  We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).  We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. *Id*.  Thus, a trial court abuses its discretion in denying a motion for new

8

trial only when no reasonable view of the record could support the trial court's ruling. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

To be entitled to a new trial based on newly discovered evidence, Scott was required to show that: (1) the alleged newly discovered evidence was unknown and unavailable to him at the time of trial; (2) his failure to discover or obtain the evidence was not due to a lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in another trial. *Keeter*, 74 S.W.3d at 36-37.

On this record, we cannot conclude that the district court abused its discretion in denying the motion for new trial. Scott had attempted to implicate May during his trial. The jury had already heard evidence—from May himself—that he had confessed to committing the crime but that his confession was false and a product of threats and coercion from Scott. In light of this and other evidence, the district court did not abuse its discretion in finding that testimony from two inmates who claimed that May confessed to committing the crime was cumulative, not credible, and would not have probably brought about a different result on another trial.

We overrule Scott's second point of error.

**Ineffective assistance of counsel**

In his first point of error, Scott alleges ineffective assistance of counsel during the guilt/innocence phase of trial. Scott contends that his trial counsel was deficient with respect to essentially three sets of issues. First, Scott argues that counsel was deficient in failing to challenge the indictment—which he characterizes as a faulty attempt to charge him with burglary

9

under section 30.02(a)(1) of the penal code—and in failing subsequently to object to the jury charge and argument as misstating the intent element under section 30.02(a)(1). Relatedly, in a supplemental brief, Scott brings an additional point of error contending that the indictment did not charge him with any offense and, therefore, failed to invoke the district court's subject-matter jurisdiction.

Second, Scott maintains that trial counsel "[f]ailed to effectively conduct voir dire and obtain strikes for cause on jurors who had been victims of past burglaries, leading to having to use peremptory strikes to remove many of these veniremen and to having two such veniremen being put on the jury." Third, Scott complains that counsel failed to take a number of steps that he now contends would have better developed a defensive theory that he had been an unwitting participant in a burglary committed by May:

- "Failed to even attempt to put Defendant on the stand . . . ."

- "Failed to cross-examine Stephen May on the fact that May had previously told defense counsel that he would exercise the Fifth Amendment if called to testify."

- "Failed to cross-examine Stephen May on whether he used the name 'James Anderson.'"

- "Failed to attempt to introduce and publish to the jury the Exculpatory Statements by Stephen May, under Rule 803(24)."

- "Failed to object to the trial court's seating Mr. May's lawyer on the witness stand with May, and allowing the two to converse during questioning by defense counsel."

- "Failed to seek a jury charge of a Mistake-of-Fact defense."

- "Failed to argue Mistake of Fact in closing argument."

10

- "Failed to question Michael Nichols on whether he knew a 'James Anderson' or whether he could describe James Anderson or identify him through a photograph or in person."

Scott urges that these "failures" by trial counsel are "sufficient in their gravity and prejudice," both individually and in combination, to constitute denial of his right to effective assistance of counsel at guilt/innocence.

To prove ineffective assistance of counsel, an appellant must establish both that his trial counsel performed deficiently and that the deficiency operated to prejudice him. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "In evaluating the first component, reviewing courts must not second-guess legitimate strategic or tactical decisions made by trial counsel in the midst of trial, but instead 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]'" *Id*. (quoting *Strickland*, 466 U.S. at 689). "This means that unless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate 'unless the challenged conduct was so outrageous that no competent attorney would have engaged in it.'" *Id*. at 696-97 (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

"In the usual case in which an ineffective-assistance claim is made, 'the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional.'" *Cannon v. State*, 252 S.W.3d 342, 349

11

(Tex. Crim. App. 2008) (quoting *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002)). Only in "rare ineffective-assistance cases" is the record on direct appeal sufficient for an appellate court to make a decision on the merits. *Id*. at 350.

Scott brings his ineffective-assistance claims for the first time on direct appeal. As we explain below, for each alleged deficiency by trial counsel, we do not regard the record in this case as sufficient to show that trial counsel acted outside the bounds of what any competent attorney would have done. *See Morales*, 253 S.W.3d at 697. Additionally, in many instances, Scott fails to show how, but for the alleged deficiencies, "the result of the proceeding would have different." *See Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007).

### Decisions regarding culpable mental state

The indictment alleged that, in relevant part, Scott "did then and there intentionally or knowingly enter a habitation, without the effective consent of Linda Jones, the owner thereof, and attempted to commit or committed theft of property." These allegations track the elements of burglary under section 30.02(a)(3) of the penal code and were sufficient to charge that offense. *See* Tex. Penal Code Ann. § 30.02(a)(3) ("A person commits an offense if, without the effective consent of the owner, the person . . . enters a building or habitation and commits or attempts to commit a felony, theft, or an assault."). However, the caption of the indictment referred to "Burglary – Habitation Entry with Commission of Theft F2 30.02.1.a," which Scott construes as a misprinted reference to penal code section 30.02(a)(1). Under section 30.02(a)(1), "[a] person commits an offense if, without the effective consent of the owner, the person . . . enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a

12

felony, theft, or an assault." *See id.* § 30.02(a)(1). To prove burglary under section 30.01(a)(1), "the intent to commit a felony or theft must exist at the moment of entry," *DeVaughn v. State*, 749 S.W.2d 62, 65 (Tex. Crim. App. 1989), while under section (a)(3) the requisite intent can be formed after entry. *See Rivera v. State*, 808 S.W.2d 80, 92 (Tex. Crim. App. 1991). Several of Scott's ineffective assistance arguments are focused on this important distinction.

Scott characterizes the charging instrument as a defective indictment for burglary under section 30.02(a)(1) that enabled the State to convict him of that offense without proving the requisite element of intent to commit theft at time of entry. Relatedly, in a supplemental brief, Scott asserts an additional point of error contending that the indictment's defects constituted failure to allege an offense and that the instrument, therefore, was not an indictment and did not invoke the district court's subject-matter jurisdiction. *See Duron v. State*, 956 S.W.2d 547, 550-51 (Tex. Crim. App. 1997). Scott argues that his conviction is void or, in the alternative, that his trial counsel was deficient in failing to object to the indictment so as to force the State to prove that he intended at time of entry to commit theft. *See DeVaughn*, 749 S.W.3d at 65. Similarly, Scott complains that trial counsel failed to object to the jury charge and to statements by the State during voir dire on the basis that they misstated the intent element under section 30.02(a)(1).[4]

Scott's arguments hinge on the significance of the caption's reference to an offense vis a vis the offense of burglary under section 30.02(a)(3) charged in the body of the indictment. However, "the caption is not part of the indictment," *Adams v. State*, 222 S.W.3d 37, 53

---

[4] Scott complains of the following statement: "Intent I will tell you can be formed in an instant. . . . So there is no—how should I say—it can be formed in an instant. You don't have to have what we call usually premeditated [sic]."

13

(Tex. App.—Austin 2005, pet. ref'd); *see Thibodeaux v. State*, 628 S.W.2d 485, 487-88 (Tex. App.—Texarkana 1982, no pet.) (terming caption "harmless surplusage."), and an inconsistency between the offense alleged in the body of the indictment and the caption does not constitute failure to allege an offense. *See id.*; *see also* 41 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 20.62 (2d ed. 2001) ("If . . . the caption identifies the charged offense as one different than what is actually charged in the charging instrument, this is of no significance. It does not constitute a defect in the charging instrument, nor does it give rise to some sort of fatal variance when the proof at trial shows the offense charged in the instrument proper rather than the offense specified by the name in the caption."). At most, such an inconsistency might be a basis for relief if Scott could prove that he was somehow misled to his prejudice by reasonable reliance upon information contained in the caption, *see Thibodeaux*, 628 S.W.2d at 487, although "in light of the traditional rule, a reasonable accused most likely could not rely upon the designation of the offense by name in the caption where that conflicts with the factual allegations in the body of the charging instrument." 41 Dix & Dawson, *supra*, § 20.63.

Accordingly, we overrule Scott's supplemental point of error. We also cannot conclude on this record that trial counsel's decisions not to object to the indictment, jury charge, or the State's statements during voir dire were "so outrageous that no competent attorney would have engaged in it." To the contrary, trial counsel's actions were consistent with an understanding—and a correct one—that Scott had been charged with burglary under section 30.02(a)(3) rather than (a)(1).

14

*Decisions during voir dire*

Scott asserts that trial counsel was deficient in using peremptory challenges rather than challenges for cause on venirepersons who had been burglary victims themselves. According to Scott, there were "no fewer than 24 potential jurors who had been victims of past burglaries, ranging from minor to very serious incidents." The record reflects that Scott's trial counsel did successfully move to strike six of these jurors for cause, and he used seven of his ten peremptory strikes on other burglary victims. Scott complains that trial counsel should have challenged for cause all of the burglary victims and used his peremptory challenges on other venirepersons likely to be sympathetic to the State. Because trial counsel failed to establish those challenges, Scott urges that he was forced to accept two jurors who had been burglary victims.

We have reviewed the record from voir dire, and we cannot conclude that Scott has established that trial counsel's questions, challenges, or strikes (or his decisions not to challenge, strike, or ask certain questions) were "so outrageous that no competent attorney would have engaged in it." The record reflects that, among other things, trial counsel conducted a thorough voir dire examination. The answers from the two burglary victims indicated that one had been burglarized thirty-five years earlier, and that both indicated that they could be impartial jurors. Scott has failed to satisfy his burden of proof.

*Decision not to call Scott to testify*

Turning to Scott's complaints relating to his theory that May had committed the burglary and/or that he had been an unwitting participant, we note again that the jury heard evidence including that Ms. Jones had found her garage door broken and Scott emerging from her house,

15

that Scott gave explanations of his presence that did not square with the facts known to Jones (e.g., his alleged statement about a carpet job at a house that didn't have carpet), that Scott fled in his van upon learning that Jones was calling 911 (even driving through her neighbor's yard to reach the street), and that several of Jones's possessions were later found in the van. Against this backdrop, Scott asserts that his trial counsel was deficient, and that he was harmed, by several decisions by trial counsel that he now contends weakened his defense.

Scott complains that trial counsel "failed to even attempt to put Defendant on the stand in the guilt/innocence phase of trial." This was deficient, according to Scott, because he was the only person who could testify about May's alleged involvement in the crime. There are countless strategic or tactical reasons why Scott's trial counsel may have decided not to have his client testify and instead make do with the testimony elicited through other witnesses. As the State observes, Scott had numerous prior convictions which could have been used to impeach his credibility on the witness stand. *See* Tex. R. Evid. 609(a). Scott asserts that these prior convictions "were so remote in time as to be presumptively inadmissible under Rule 609(b)."[5] Generally, rule 609(b) prohibits the admission of prior convictions "if a period of more than ten years has elapsed since the date of conviction." Tex. R. Evid. 609(b). However, rule 609(b) further states that such convictions may be admissible if "the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." *Id*. Many of Scott's prior convictions involved the offenses of theft and burglary of a habitation, offenses that the district court could have determined were similar to the current offense.

---

[5] The record reflects that these prior convictions occurred between 1990 and 1992.

16

If the district court had determined, in its discretion, that the probative value of such convictions outweighed their prejudicial effect, the district court could have admitted them. Additionally, the prior convictions could have been admitted on some other basis.

Even if these prior convictions were not admitted, trial counsel could reasonably have determined that subjecting Scott to cross-examination was not worth the risk to his defense. On this record, we cannot conclude that trial counsel's decision not to call Scott to testify was "so outrageous that no competent attorney would have engaged in it."

### *Decision not to cross-examine May regarding assertion of Fifth Amendment*

Next, Scott asserts that trial counsel should have questioned May about whether he had previously told defense counsel and the Court that he would exercise the Fifth Amendment if called to testify. Scott asserts that if the jury had heard such testimony, "there is a reasonable probability that the jury's confidence in his denials would have been shaken." There is nothing in the record to support this assertion. Furthermore, even assuming this is true, Scott fails to show prejudice in light of the evidence of Scott's guilt. On this record, we conclude that Scott has failed to show that, but for the alleged deficiency, the result of the proceeding would have been different.

### *Decision not to object regarding May's attorney*

Scott asserts that while May was testifying, he "had his counsel . . . at the witness stand" and was permitted to consult with counsel during his trial testimony. Scott argues that trial counsel was deficient in failing to object to "this peculiar procedure of having May's counsel with him at the stand" because it hindered trial counsel's examination of May and "allowed jurors to infer

17

that the trial court was favoring Mr. May in some way." Scott cites to three instances in the record in which these exchanges supposedly occurred. However, the record reflects that two of the instances occurred outside the jury's presence, during a voir dire examination to enable the district court to ascertain whether May intended to invoke his Fifth Amendment right against self-incrimination if called to testify by Scott. In that context, the district court stated, as May took the stand, "Your attorney will be right behind you," and added, "Let the record reflect Mr. May does have counsel sitting right behind him two feet away which he can consult with at any point during the proceeding." After May testified that he would not be invoking the privilege and being admonished about the consequences of that waiver, the jury returned to the courtroom and Scott's trial counsel began his examination. After counsel elicited May's name, age, that May was then in custody for burglary, and that May had met Scott while housed in the same Travis County Jail unit, counsel handed May a copy of his written statements to "refresh your memory regarding these prior statements that you have made." At this juncture, the district court requested a copy, and then indicated that some unidentified person would be making a copy. The court then requested Scott's trial counsel to proceed. The record then indicates that witness and counsel conferred off-the-record. This is the sole instance in which the record reflects May conferred with counsel in the jury's presence. After the court inquired, "Are we ready?" May's counsel requested to approach the bench. The district court ordered a recess and sent the jury out. During the recess, May's counsel raised an issue regarding when May signed one of the statements. After concluding that the matter went to the weight of the evidence, the jury was brought back in. There are no further indications that May consulted with counsel during his subsequent testimony.

18

Other than the single instance in which May apparently spoke to his counsel immediately after he and the district court were handed a copy of his statements, the record does not reflect that May conferred with counsel in the presence of the jury, as Scott now contends. We also note that the district court stated, in response to a similar argument during the hearing on Scott's new trial motion, that May and his counsel had not conferred during May's testimony. We cannot conclude on this record that Scott met his burden of proving that trial counsel's failure to object was "so outrageous that no competent attorney would have engaged in it" or that if he had objected, the result of the proceeding would have been different.

### *Decisions not to question May and Nichols about "James Anderson"*

Two of the deficiencies alleged by Scott involve trial counsel's decision not to question May about whether he used the name "James Anderson," and not to question Mike Nichols on whether he knew or could identify a "James Anderson." As noted, Jones testified that when she had encountered Scott at her house, Scott claimed that he was there to "pick up some stuff" for a "Mr. James Anderson." The record is silent as to why trial counsel did not question May or Nichols about "James Anderson." Counsel could reasonably have concluded that May would simply deny being known as "James Anderson," that Nichols did not know a James Anderson, or that the witnesses otherwise would have given answers unfavorable to Scott. On this record, we cannot conclude that trial counsel's decision not to question May and Nichols on "James Anderson" was "so outrageous that no competent attorney would have engaged in it."

19

### *Decision not to attempt to admit May's written statements into evidence*

Next, Scott asserts that trial counsel was deficient in not attempting to have May's written statements admitted as substantive evidence exculpating Scott. Scott claims that if the jury had seen May's written statements purporting to admit guilt, the jury might have been more inclined to believe them. This claim is entirely speculative. We observe that the statements lack detail regarding the actual offense committed and are in many respects identical to each other. The statements' appearance, trial counsel could reasonably have concluded, would tend to support the State's theory that they were coerced or otherwise false, thereby backfiring on Scott. On this record, we cannot conclude that trial counsel's decision not to attempt to admit May's written statements into evidence was "so outrageous that no competent attorney would have engaged in it." We also conclude, especially given Jones's eyewitness testimony, that Scott has failed to show prejudice.

### *Decisions regarding mistake-of-fact defense*

Two of the alleged deficiencies alleged by Scott involve trial counsel's decision not to seek a jury instruction or argue the defense of mistake of fact. "It is a defense to prosecution that the actor through mistake formed a *reasonable* belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." Tex. Penal Code Ann. § 8.02(a) (West 2003) (emphasis added). Scott would only be entitled to a jury instruction on this defense if it was raised by the evidence. *See Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999). We have reviewed the record, and we find that such a defense was not raised by the evidence in this case. There is no evidence that Scott "through mistake formed a reasonable belief" about the reason he was at Jones's house and took her property. Therefore, trial

counsel was not deficient in not requesting such a jury instruction or explicitly arguing the defense to the jury. Additionally, Scott has failed to demonstrate that if the jury had been instructed on mistake of fact, and if trial counsel had more explicitly argued the defense during closing argument, the outcome of the proceeding would have been different.[6]

### *Conclusion regarding ineffective assistance claims*

We conclude that none of the above alleged deficiencies constitute ineffective assistance of counsel. We similarly conclude that trial counsel's totality of representation did not fall below an objective standard of reasonably effective assistance or cause Scott harm. We overrule Scott's first point of error.

---

[6] During closing argument, trial counsel did argue that the evidence presented reasonable doubt as to whether Scott had intentionally participated in the burglary and whether May had "fool[ed] Mr. Scott and fool[ed] him into doing something that Mr. Scott didn't know was a crime." Specifically, counsel suggested, albeit without any specific evidentiary support,

you could be in the same situation my client was in. . . . You could find yourself riding around with somebody who says, "I've got to go and get something over here, and it will just take a minute. Let's go on in. I'll be right back."

You say, "Okay. Fine. I'll go with you."

You go over there. The back door is open. The front door is open. I don't know how they got in. It's off the track. There's a board that's broken. . . . whether they went in through the garage and just opened the thing up and the board broke or they just went in through the back door, which was open, if you were with that person who was intent on committing a crime and you were an innocent person, there would be nothing to indicate to you that a crime was occurring.

21

**CONCLUSION**

Having overruled Scott's points of error, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   August 29, 2008

Do Not Publish